Susan Decatur, Plaintiff in error, *vs.* James K. Paulding, Secretary of the Navy, Defendant in error.

On the 3d of March, 1837, Congress passed an act giving to the widow of any officer who had died in the naval service of the United States authority to receive, out of the navy pension fund, half the monthly pay to which the deceased officer would have been entitled under the acts regulating the pay in the navy, in force on the 1st day of January, 1835. On the same day, a resolution was adopted by Congress, giving to Mrs. Decatur widow of Captain Stephen Decatur, a pension for five years, out of the navy pension fund, and in conformity with the act of 30th June, 1834, and the arrearages of the half-pay of a post captain, from the death of Commodore Decatur to the 30th June, 1834; the arrearages to be vested in trust for her by the Secretary of the Treasury. The pension and arrearages, under the act of 3d March, 1837, were paid to Mrs. Decatur on her application to Mr. Dickerson, the Secretary of the Navy, under a protest by her, that by receiving the same she did not prejudice her claim under the resolution of the same date. She applied to the Secretary of the Navy for the pension and arrears, under the resolution, which were refused by him. Afterwards, she applied to Mr. Paulding, who succeeded Mr. Dickerson as Secretary of the Navy, for the pension and arrears, which were refused by him. The Circuit Court of the County of Washington, in the District of Columbia, refused to grant a mandamus to the Secretary of the Navy, commanding him to pay the arrears, and to allow the pension under the resolution of March 3d, 1837. Held, that the judgment of the Circuit Court was correct.

In the case of Kendall *vs.* The United States, 12 Peters, 527, it was decided by the Supreme Court that the Circuit Court of Washington County, for the District of Columbia, has the power to issue a mandamus to an officer of the federal government, commanding him to do a ministerial act.

In general, the official duties of the head of one of the executive departments, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the government in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress, under which he is from time to time required to act. If he doubts, he has a right to call on the Attorney General to assist him with his counsel; and it would be difficult to imagine why a legal adviser was provided by law for the heads of departments, as well as for the President, unless their duties were regarded as executive, in which judgment and discretion were to be exercised.

If a suit should come before the Supreme Court which involved the construction of any of the laws imposing duties on the heads of the executive departments, the Court certainly would not be bound to adopt the construction given by the head of a department. And if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But the judgment of the Court upon the construction of a law, must be given in a case in which they have jurisdiction; and in which it is their duty to interpret the act of Congress, in order to ascertain the rights of the parties in the cause before them. The Court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise his discretion or judgment. Nor can it, by mandamus, act directly upon the officer, or guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties. The interference of the Court with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief; and this power was never intended to be given to them.

The principles stated and decided in the case of Kendall *vs.* The United States, 12 Peters, 610 and 614, relative to the exercise of jurisdiction by the Circuit Court of the District of Columbia, where the acts of officers of the executive departments of the United States may be inquired into for the purpose of directing a mandamus to such officers, affirmed.

[Decatur *vs.* Paulding.]

IN error to the Circuit Court of the United States for the county of Washington, in the District of Columbia.

On the 3d of March, 1837, an act was passed by Congress, giving to the widow of any officer who had died in the naval service of the United States, out of the navy pension fund, half the monthly pay to which the deceased officer had been entitled to receive under the laws in force on the 1st day of January, 1835; the half-pay to commence from the death of such officer: the pension so allowed, to cease on the intermarriage or death of the widow, &c.

On the same 3d of March, 1837, a resolution was passed by Congress, " granting a pension to Susan Decatur, widow of the late Stephen Decatur." The resolution directs that Mrs. Susan Decatur be paid from the navy pension fund, a pension for five years, commencing from the 30th June, 1834, in conformity with the provisions "of the act concerning naval pensions and the navy pension fund, passed thirtieth June, eighteen hundred and thirty-four, and that she be allowed from said fund the arrearages of the half-pay of a post captain, from the death of Commodore Decatur to the thirtieth of June, eighteen hundred and thirty-four, together with the pension hereby allowed her; and that the arrearage of said pension be invested in the Secretary of the Treasury in trust for the use of the said Susan Decatur : provided that the said pension shall cease on the death or marriage of the said Susan Decatur."

Under the law of March 3d, 1837, Mrs. Decatur applied to Mahlon Dickerson, Esq., then Secretary of the Navy, and trustee of the navy pension fund, and received out of the navy pension fund the whole amount of the pension, which, as the widow of Commodore Decatur, she was entitled to by the provisions of the law. This was received by her under a reservation of her rights under the resolution of the 3d of March, 1837; she at the same time claiming the benefit of that resolution.

Mr. Dickerson, the Secretary of the Navy, referred the question whether Mrs. Decatur was entitled to both pensions, to the Attorney General of the United States ; and he decided that she might make her election to receive either pension, but that she was not entitled to both. On the retirement of Mr. Dickerson from the navy department, he was succeeded by Mr. Paulding, the defendant in error. In the autumn of 1838, Mrs. Decatur applied to Mr. Paulding, requiring him, as the trustee of the navy pension fund, to pay the sum claimed to be due to her under the resolution of Congress of March 3d, 1837, stated in an amended petition filed in the Circuit Court to be eighteen thousand five hundred and ninety-seven dollars, with interest on the same. It was stated that there were ample funds, and money of the navy pension fund to pay the amount claimed.

The Secretary of the Navy refused to comply with this demand ; and on the 25th November, 1837, Mrs. Decatur applied by petition to the Circuit Court of the county of Washington, setting forth all

[Decatur *vs.* Paulding.]

the circumstances of the case, and asking from the Court a writ of mandamus, " to be directed to the said James K. Paulding, Secretary of the Navy of the United States, commanding him, that he shall fully comply with, obey, and execute, the aforesaid resolution of Congress, of the 3d of March, 1837, by paying to your petitioner and to the Secretary of the Treasury, in manner and form as said act or resolution provides, or as your honours shall think proper, the full and entire amount of the aforesaid sum or sums of money, with interest thereon, or such part or portion thereof as your honours may direct."

The Circuit Court granted a rule on the Secretrary of the Navy to show cause why the writ of mandamus, as prayed for, should not be issued; and to this rule the Secretary made the following return:

To the honourable the judges of the Circuit Court of the District of Columbia, for Washington County.

The undersigned, James K. Paulding, Secretary of the Navy of the United States, respectfully states:

That he hath been served with notice of an order or rule from this honourable Court, requiring him to show cause why a writ of mandamus should not be issued from the said Court, directed to him as Secretary of the Navy of the United States, upon the petition of Mrs. Susan Decatur, commanding him to pay certain sums of money out of the navy pension fund, claimed by said petitioner to be due to her under a certain resolution of Congress referred to in the aforesaid petition.

The undersigned considers it his duty, in the first place, to protest against the jurisdiction of the Circuit Court invoked on this occasion, for the following reasons:

1st. Because, as Secretary of the Navy of the United States, he is not subject, in the discharge of the duties of his office by the Constitution and laws of the United States, to the control, supervision, and direction of the said Court.

2d. Because, as such Secretary, he is by law constituted the trustee of the navy pension fund, and it is made his duty, as such, "to receive applications for pensions, and to grant the same according to the terms of the acts of Congress in such cases provided." He is also required to cause books to be opened, and regular accounts to be kept, showing the condition of the navy and privateer pension funds, the receipts and expenditures thereof, the names of the pensioners, and the dates and amount of their respective pensions, with a statement of the act or acts of Congress under which the same may be granted; and he shall annually report to Congress an abstract showing the condition of these funds in all these particulars, and the receipts and expenditures during the year; and there is no law authorizing the Circuit Court of this District to control and direct him in the discharge of these duties.

3d. Because such jurisdiction in this Court would, if assumed, operate as such an interference with the discharge of the official

duties of the undersigned, as to make it impossible for him to perform them as required and intended, and would transfer to the said Court the discharge of the said duties, and the whole management and disposition of the said fund, and subject all applicants for pensions to the delay, expense, and embarrassments of legal controversies as to their rights, and to a suspension of the provisions to which they might be entitled under the laws, till these controversies were judicially decided.

4th. Because such a jurisdiction in the Circuit Court would make the United States sueable in that Court; and subject the money of the United States, in the Treasury of the United States, to be taken therefrom by the judgments of said Court.

5th. Because if the Circuit Court assumes the jurisdiction of compelling the Secretary of the Navy, or the head of any other department, to revise and reverse the decisions that may have been made by their predecessors in office, these officers will necessarily be taken off from the discharge of their immediate and most urgent public duties, and made to apply their time and attention, and that of their clerks in the departments, in an endless review and reconsideration of antiquated claims and settled questions, to the delay and hinderance of measures of vital importance to the national welfare and safety.

For these and other reasons, which he trusts will be obvious, on further consideration, to the Court, he respectfully objects to the jurisdiction assumed in this case; and will now proceed, under such protest, to show cause why the mandamus prayed for should not be issued.

The undersigned was somewhat surprised to see it stated in the petition of the relatrix, that "he had been often requested by her to pay the two several sums of money stated in the petition, amounting to the aggregate sum of twenty-three thousand four hundred and twenty-two dollars and twenty-five cents;" and that he had refused so to do; and, that "he pretended to say that the petitioner was not entitled to the same, or any part thereof." The undersigned has no recollection of ever having refused the payment of any sum, or any sums of money demanded in behalf of Mrs. Decatur, except so far as this may have been inferred from his declining to reconsider her claim on grounds which he will now proceed to state.

Sometime in September, 1838, the undersigned received a communication from the counsel of Mrs. Decatur, informing him that they had examined the documents connected with her claims, and the opinion of the late Attorney General, Mr. Butler, upon the strength of which the claim appeared to have been disallowed by his predecessor, and that they were satisfied that the decision which had been made was not warranted by law.

A reconsideration of the case was then asked of the undersigned, "if he felt himself at liberty to revise the decision of his predecessor." And if this could not be complied with, he was then asked

[Decatur *vs*. Paulding.]

" to give such instructions to the District Attorney as will enable him to concur with them in bringing the subject before a competent tribunal, in order to obtain a judicial decision upon the case." To this application the undersigned replied, " that the claim having been examined and decided by his predecessor, in conformity with the opinion of the late Attorney General, he did not feel himself authorized to disturb that decision, as no new facts had been adduced to call for a re-examination." And further, that he also declined the second proposition of the counsel; " being unwilling to give a precedent, which, if once established, will place every executive officer of the government in the attitude of a defendant, in all cases where individuals are dissatisfied with his decisions."

After this reply, no further application was made to the undersigned; but in February last, a memorial was presented to the President of the United States in behalf of the claimant, by her counsel, in which a reconsideration of the case and his interference were requested, and that " if he should be of opinion that the claim was lawful and proper to be allowed, that he would direct the Secretary of the Navy to execute the resolution in favour of the claimant without further delay." In this memorial the opinion of the late Attorney General, and the decision of the late Secretary of the Navy were stated; and it was added that " the claim had been recently renewed before the present Secretary of the Navy, and again rejected, not upon a consideration of its merits, but because it had been before acted upon and denied, and no new matter shown upon the new application."

On this memorial the President decided, that " he did not find in the papers submitted to him, sufficient to justify the interference asked for;" and of this the counsel for the claimant was informed.

The undersigned has been thus particular, for the purpose of showing distinctly the nature of the application, and its refusal. He desires it should be seen that he placed this refusal solely upon the ground that his predecessor had decided it, after a full consideration, and after calling for the official opinion of the Attorney General, and that no new facts were adduced to authorize him to reconsider it; and he desires now that this shall be considered by the Court as a distinct ground of objection to the relief now prayed for.

He presumes, that even if the Court shall decide that it possesses the jurisdiction claimed, it will not consider that it is bound to exercise it in all cases, and under all circumstances; and that after a claim has been heard and rejected by the officer authorized to decide upon it, it still remains in the power of the claimant to call it up, and compel a reconsideration of it from every successive officer, who may be subsequently appointed in the place of the officer making the decision. It is obvious, that if such a course is allowed, there can be no such thing as the final decision of a controverted claim.

The executive officers must always continue to consider it as an

open claim, and the funds of the government as still liable to its demands. Nor is it possible for the affairs of the government to be properly administered, if the executive officers, instead of devoting themselves to the discharge of the duties brought before them; and which are abundantly sufficient to occupy all their time and atten- tion; are to be called upon to go back to the times of their prede- cessors, and determine whether they have properly discharged the duties they were required to execute.

These considerations, and an experience of the impossibility of thus conducting the public business committed to them, have long since obliged all the executive departments, under every adminis- tration, with the sanction, as the undersigned believes, of several successive attorneys general, to adopt the rule, that no claim once fully heard and rejected by the competent officer can be considered open to the review and reconsideration of the successor to such officer, unless new matter can be shown to justify such re-exami- nation.

It is evidently as important to the public interests, if the Courts shall be considered as invested with the jurisdiction claimed on this occasion, that they should respect this rule.

The inconveniences resulting from disregarding it by the Courts in the exercise of such a jurisdiction are the same. The same un- settled state of controverted claims, the same uncertainty as to the national funds, kept open to rejected demands, which may in- terfere with the rights of other claimants and with the public in- terests, and the same misemployment of the time and attention of the public officers to cases already decided by their predecessors, must continually occur; for, although the decision is ultimately made by the Court, yet the officer to whom the command is to be directed must examine the case and every thing connected with it, so as to present it to the consideration of the Court. Indeed, much more of his time and attention may be withdrawn from the im- mediate duties of his station, by his being called to answer before a judicial tribunal on such occasions, and make that defence against the proceedings which he may feel bound to do, than by a reconsi- deration of the claim.

Under such circumstances it has been heretofore thought neces- sary by claimants whose demands have been rejected, and who were dissatisfied with such rejection, to make their application to Congress; and where it has been thought reasonable and just by the legislature that their claims should be allowed, acts have passed for their allowance, or the accounting officers have been authorized to open and reconsider their claims. And it appears to the under- signed that there would be a peculiar propriety in seeking that mode of redress in relation to the present claim, which arises from the circumstance of there being two legislative enactments of the same date, making nearly similar provisions for the claimant, and the question being whether she is entitled to one or both of these

[Decatur *vs.* Paulding.]

provisions. The decision of that question by the late Secretary of the Navy, and the opinion of the Attorney General, upon which it is founded, are herewith presented to the Court.

The undersigned observes that a specific sum is stated in the petition as being the amount of the pension claimed. He has already stated that no sum was stated in the application made to him. It appears from the amount stated, that the petitioner claims not only half the pay to which the deceased was entitled, but half the pay and rations, or pay and emoluments.

This will present to the Court, in case they should assume the jurisdiction, and decide in favour of the petitioner, a question under the pension laws as to the construction of the words "half the pay" and "half the monthly pay," in those acts of Congress. The uniform construction of all these laws, in all the departments of the government, has invariably been such as to confine the pension to the pay proper; the expression being in all these acts "pay," and not pay and rations, or pay and emoluments. The undersigned is not aware that any claimant of a pension has ever before suggested a different construction.

In conclusion, he admits, in relation to the state of the navy pension fund, that there is at present a sufficient amount to pay the claim of the petitioner, if it was now to be paid. What may be its state when the payment may be ordered, if it should be ordered, it will be impossible for him to state; inasmuch as it will depend on the number of applicants whose claims may be made and allowed in the mean time. And he thinks it proper to state, that if the payment of the sum stated in the petition shall be commanded by the decision of the Court, in consequence of the Court's deciding that the pensioners under these acts of Congress are entitled to half-pay and rations, or pay and emoluments, of the deceased officers and seamen, then he apprehends the navy pension fund would be greatly insufficient to pay the present claimant and the other pensioners whose claims have been allowed, but who have only received half the pay proper, exclusive of rations or emoluments. All which he respectfully submits. J. K. PAULDING.

## OPINION OF THE ATTORNEY GENERAL.

*Attorney General's Office, April 11th, 1837.*

Sir—I have had the honour to receive your letter of the 15th ult'o, relative to the case of Mrs. Susan Decatur.

It is assumed in your statement of the case, that Mrs. Decatur would be entitled to the pension granted by the act of the 3d ultimo, for the equitable administration of the navy pension fund, "were it not for the doubt created by the passage, on the same day, of the joint resolution for her special benefit. And on these two laws you inquire whether she is entitled under the resolution, or under the act, or under both."

This case differs from that of Mrs. Perry, referred to in the note of Mrs. Decatur, accompanying your letter, inasmuch as the law

under which Mrs. Perry ultimately obtained her pension was in existence at the time of his death, at which time she was also entitled (although not then aware of the fact) to its benefits. I held, in her case, that the law granting her an annuity, for such it was called, could not deprive her of the pension given by a pre-existing law; and that as Congress were presumed to be acquainted with the laws in force, the legal intendment must be, that the annuity was designed as an additional provision; and, consequently, that she was entitled to both.

After maturely considering the history of the general and special provisions on which the present case depends, I am of opinion that but one pension can be allowed; but if the general provision includes the case of Mrs. Decatur, then I am of opinion she is entitled to take, under that provision, or under the joint resolution, at her election.          I am, very respectfully, your ob't serv.

                                                        B. F. BUTLER.

The Hon. MAHLON DICKERSON,
          *Secretary of the Navy.*

LETTER FROM SECRETARY OF THE NAVY TO MRS. DECATUR.

                                *Navy Department,* 14th *April,* 1837.

Dear Madam—The Attorney General has given his opinion, that in your case but one pension can be allowed; he, however, thinks that you have your selection to take under the general law, or under the resolution in your particular case; as soon as your pleasure upon this subject shall be known, the warrant for pension shall be made out.

I am, with great respect and esteem, your ob't h'le s't,

                                                        M. DICKERSON.

Mrs. SUSAN DECATUR,
          *Georgetown, D. C.*

The Circuit Court overruled the order to show cause to the Secretary of the Navy, and refused the application of Mrs. Decatur for a mandamus; and this writ of error was prosecuted by her.

The case was argued by Mr. Brent and Mr. Coxe, for the plaintiff in error; and by Mr. Gilpin, Attorney General of the United States, for the defendant.

Upon the part of the plaintiff in error it was said:

1st. That there was error in the refusal of the Court below to award the mandamus, and that it ought to have been granted.

2d. That the Secretary of the Navy, the appellee, is bound to execute said resolution, and that he has no discretion in so doing.

3d. That the said resolution being clear and explicit as an act of legislation, the said Secretary of the Navy ought not, (acting as he did, ministerially, in carrying it into execution,) to refuse to execute the same.

[Decatur *vs.* Paulding.]

4th. That having refused to do the same, the Court ought to have issued the mandamus.

5th. If there be a doubt upon the laws of Congress, whether the relatrix is entitled, that doubt is removed by an examination of the journals and proceedings of Congress connected with the claim of the relatrix.

The counsel for the plaintiff, in support of the jurisdiction of the Circuit Court to issue the mandamus as prayed for, cited Marbury *vs.* Madison, 1 Cranch, 137. 6 Peters, 241. Kendall, Postmaster-general, *vs.* The United States, 12 Peters, 524.

They contended, that it was the intention of Congress to give the pension to Mrs. Decatur under the resolution; and also a pension under the general pension law, passed on the same day the resolution was adopted and approved.

The pensions, it will be seen by an examination of the resolution and of the law, are not the same, but are cumulative. Each law is a clear and distinct act of legislation, expressing the will of the legislature, directed to the Secretary of the Navy, in a ministerial capacity; and he should have obeyed both. He has no right to collate the two laws for the purpose of interpreting them. While acting under the provisions of the pension law, the Secretary of the Navy may have a discretion, and he is to inquire into facts on which he is to decide; but under the first resolution giving a pension to Mrs. Decatur, he is to act only ministerially.

The history of the proceedings of Congress, granting a pension to Mrs. Decatur, by the resolution, and contemporaneously giving pensions to the widows of officers of the navy, shows that the claims of the plaintiff in error are well founded. The allowances are different. The rate of the pension under the resolution, and that given by the law, is different. One is given for five years, and a trustee is to hold the arrears, for the use of Mrs. Decatur. The sum given by the resolution is greater than that given by the pension law. One allows the rations of the captain to form a part of the estimate; the law gives only half of the pay proper.

The true construction of the law and resolution will be obtained by a reference to the principles which have been applied to wills giving more than one legacy to the same persons. The Courts, in such cases, always adjudged, that when the legacies are distinct and independent, and have no reference to each other, both legacies are payable. Cited, 1 Brown's Ch. Cases, 389. 6 Madox, 300. 303. 2 Russell's Rep. 272. 1 Coxe's Cases, 391.

When there is a doubt as to the intention of the legislature, the law should be construed favourably to those who claim under it. 6 Dane's Abr. 570.

Mr. Gilpin, for the defendant in error.

The navy pension fund was established by the act of 2d March, 1799. 1 Story's Laws, 677. It was made up from a certain proportion of the sales of prizes, taken by the officers and seamen of

[Decatur *vs.* Paulding.]

the American navy, the investment of which it provided for, so as to establish the fund in question. From the time of its establishment, occasional changes were made (1 Story's Laws, 769. 2 Story's Laws, 943. 1284. 1399. 3 Story's Laws 1565. 1637. 1731. 1934. 4 Story's Laws, 2129. 2299) in the organization of the trust, the amount of pension, and the persons entitled to it. In the year 1832, the fund was in the Treasury of the United States, in charge of three commissioners, being the Secretaries of the Navy, War, and Treasury Departments, who were authorized to make the necessary regulations for admitting pensioners and paying pensions; and the payments to the pensioners were made by warrants drawn in their favour, by the Secretary of the Navy, on the Treasurer of the United States; every officer, seaman, and marine, disabled in the line of his duty, received such pension as the commissioners might allow, not exceeding his full monthly pay; and the widow of any one killed in service during the late war, or dead of wounds and casualties then received, was to have half his monthly pay for twenty-five years after his death. On the 10th July, 1832, (4 Story's Laws, 2309,) the navy pension fund was reorganized; the commissioners were abolished; their duties were imposed on the Secretary of the Navy alone; and he was to "receive applications for pensions, and grant them according to the terms of the acts of Congress;" but no change was made as to the persons entitled to receive them, or in the amounts. On the 30th June, 1834, (4 Story's Laws, 2385,) an act was passed, adding to the persons previously entitled to pensions, " the widows of officers, seamen, and marines, who died in the naval service, since 1st January, 1824, or who might die by reason of disease, casualties, or injuries received while in the line of their duty." This law did not include the widows of those dying in the naval service previous to that day, although they might have contributed as much to the fund as those who died after it. Such was the case in regard to the plaintiff in error, the widow of the gallant Decatur. In 1830 a special resolution was introduced in Congress to grant her half pay for five years from 30th June, 1834, which, in the succeeding year, was extended, by adding thereto arrearages of half pay, from her husband's death to the 30th June, 1834, (Journal of House of Representatives, 336;) in that shape it passed the House, and was sent to the Senate. In the meanwhile, that body had taken up the subject, and had before it a general law to provide for the widows of all officers, seamen, and marines similarly situated; which bill they passed and sent to the House, without adopting the special measure for Mrs. Decatur's relief. The general bill then gave rise to discussion, and it not having passed the day before the close of the session, the Senate adopted the special resolution in regard to the plaintiff in error, which was approved by the President. Subsequent to the passage of the special resolution, the general bill was also passed by both Houses, and approved by the President, among the last acts at the close of the session. Journal of the Senate, 41. 132. 206. 300. 318. 330. 338. 340. Journal of the House of Repre-

[Decatur vs. Paulding.]

sentatives, 569.    The general law embraced in its provisions the case of Mrs. Decatur, and differed in no respect from the special resolution, except that it extended the pension to her death, instead of limiting it, as the resolution did, to five years.

The application by Mrs. Decatur to Secretary Dickerson, to pay her a double pension, the one under the general act, and the other under the special resolution, was refused by the advice of the Attorney General; and she received the sum to which she was entitled under the former, without, however, waiving her claim to the latter. She subsequently applied to Secretary Paulding, the defendant in error, to revise this decision of his predecessor, which he declined to do; and afterwards to the President, who decided, that "he did not find in the papers submitted to him, sufficient to justify the interference asked for." Thereupon, Mrs. Decatur applied to the Circuit Court of this district to issue a mandamus to Secretary Paulding, to comply with the special resolution, by paying to Mrs. Decatur, and to the Secretary of the Treasury, in trust for her, the full amount of the arrearages and pension, including therein half the rations, as well as half the monthly pay.    The refusal of the Court to issue such a mandamus, is alleged to be error.

1. It is submitted that there was no error in this refusal of the Court below, because that Court was not authorized to issue a mandamus, for the purposes prayed for.

It is an attempt to compel the Secretary of the Navy, through the mandate of an inferior and local tribunal, to take from the Treasury of the United States a sum raised by the gallantry of men, most of whom are dead, and placed there under his charge, as their trustee, and to appropriate it in a manner contrary to what in his own judgment the law sanctions, contrary to the opinion of the Attorney General, and not approved of or sanctioned by the chief executive officer.    There must be strong grounds to authorize such an exercise of power, to permit the Circuit Court of this District thus to compel a public officer to take money from the treasury, when he believes he is forbidden by law so to do, and when he is confirmed in that belief by an officer whose opinion he is, by law, to require, in every doubtful case.    It effects, in practice, a radical change in the mode of managing and disbursing the public money; it takes, in point of fact, the responsibility of superintending a particular fund from the officer made answerable for it by law, and transfers it to a Court of justice; it changes materially the modes of proceeding in relation to the trust; it may delay the payment of numerous pensioners, during the progress of a tedious and complicated litigation; if the power of prohibiting as well as compelling payments to certain pensioners exists, (and it results from the same principle,) those of whose rights the Secretary of the Navy, as their trustee, has no doubt, may be forced to contend for them by expensive and protracted lawsuits.

Nor is there any usage or principle of law which would sanction such an interference as was sought from, but properly refused

by the Circuit Court. The Secretary of the Navy is an executive officer; the cases in which any Court, even one admitted to have the power of issuing a mandamus, can control such an officer in the performance of an executive duty, have been fully discussed; this Court has examined the subject so as to lay down the rules by which he may be guided; yet in no instance has a case like the present been sustained by a judicial sanction.

The case of Marbury *vs.* Madison, (1 Cranch, 137,) was that of a commission already signed by the President, sealed, and ready for delivery. This Court held, that a Court having legal authority to issue a mandamus, might do so in such a case, because the course prescribed was a precise one, pointed out by law, to be strictly pursued, and "in which there could be no variation." 1 Cranch, 158. Apply this test to the duty devolved on the Secretary of the Navy, as trustee of this fund. Was he bound to pay a certain sum under all circumstances? Was it a proceeding "which could not be varied," even if the fund was insufficient? Must he not look to the state of the fund, to other existing claims upon it under the laws then in force? Could he pay it out of the fund committed to him, if already exhausted, or if there were other legal claims upon it, made prior to, or at the same time with Mrs. Decatur's, under prior or equal legal sanctions, and it was insufficient to pay all? By this test it was a proceeding that might, nay, must, of necessity, be varied; the exercise of the trustee's discretion was required to examine the state of the fund and he validity of other claims; and the performance of the required act must depend on and might be varied by the result of that examination. Again, this Court held, in the same case, (1 Cranch, 164,) that where the Secretary of War was directed by an act of Congress to place certain designated names on the pension list, his refusal would authorize a mandamus. In such a case the duty of the executive officer is plain; had Congress directed Mrs. Decatur's name to be put on the pension list, it would have prescribed an act merely and strictly ministerial; but they order him to pay her out of the navy pension fund, of which he is trustee, which he is bound to administer and dispose of according to other existing laws, and to the legal sufficiency of which he must look whenever he makes a payment. So when it was held, that the Secretary of State might be compelled to deliver a patent which had been duly signed, sealed, and recorded, (1 Cranch, 165,) we have a proceeding which could not be varied; the Secretary could do nothing but the act required; it had no communion with any other act; but suppose the patent had not been signed and sealed, and that the Secretary was of opinion, that all the necessary prerequisites had not been complied with; or, suppose the right of the patentee was limited to a location within a certain designated body of land, (as in military bounties,) and all the lands therein had been exhausted, could the Secretary, in such a case, be compelled to issue and deliver the patent by a writ of mandamus? Again, the Court held, in the same case, that an officer might be

[Decātur *vs*. Paulding.]

compelled to do an act, peremptorily enjoined, and affecting indivi-
dual or private rights, (1 Cranch, 166;) thus distinguishing such an
act from those of a public or political character, or those which
affect the rights and interests of various persons.   To place a name
on the pension list, to deliver his patent to a patentee, to record the
commission of a justice of the peace, are acts not of a public con-
cern, but solely affecting the interest of the individual.   On these,
as the Court say, it is " their province to decide; not to inquire how
the executive, or executive officers perform duties in which they
have a discretion."   Is the plaintiff in error solely interested in the
act which she requires the Secretary of the Navy to do ?   Does it
affect her individual rights alone ?   Are not other claimants on the
fund equally interested ?   Is not the executive officer responsible
for the correctness of his decision in performing a public trust?
Are not the natiou, the public, bound to see that the fund is pro-
perly applied, and to make good any deficiency arising from an
erroneous payment, even though made under the sanction of the
Circuit Court of this district?   The tests thus established by this
Court, in the case of Marbury *vs*. Madison, exclude the act asked
for by the plaintiff in error, from the class of ministerial acts; they
place it clearly among those which are executive, and to a certain
extent discretionary.

In the case of M'Cluney *vs*. Silliman, (6 Wheat. 349,) a pre-
emption claim had been rejected by the Register of the Land Office,
on the ground that the land belonged to another; a mandamus was
refused, because the Court held, that they had no controlling power
over the officer in such a case, whatever might be the justice of the
applicant's claim; but that " the parties must be referred to the
ordinary mode of obtaining justice, and not resort to the extraor-
dinary one of a mandamus."   Yet in what respect was the pro-
ceeding asked for in that case, less sustained by law than the
present ?

The case of Kendall *vs*. The United States (12 Peters, 610,) was,
like that of Marbury *vs*. Madison, very fully examined; important
principles were settled; rules were carefully laid down; and those
cases distinguished in which an executive officer would be, and
would not be compelled to act by a mandamus.   The Court said,
that to justify such a proceeding the act required to be done, must
be " a mere, ministerial act;" the Postmaster-general was " to
credit" the relators with a certain sum exactly ascertained and re-
ported to him by an officer authorized so to do; the act was precise,
definite, and purely ministerial; no money whatever was to be
paid.   All those are points distinguishing the case from the present
one, especially the payment of money : here, too, it is to be with-
drawn out of a particular fund in the treasury, which, as the officer
having it in charge believes, is appropriated to other purposes.

These decisions of this Court seem to be sufficient to sustain the
judgment of the Court below, and they are abundantly sanctioned,
if it were necessary to go beyond them, by the opinions of other

tribunals. 3 Law Journal, 128. 5 Binney, 104. 6 Binney, 9. 1 Whart. 1. They mark with exactness the line between executive and merely ministerial duties; and they place the act which the Secretary is now called on to perform, clearly within the former. It is one requiring the exercise of deliberate judgment in the construction of a long series of laws; in a determination between conflicting legal provisions; in ascertaining the rights of different parties, that may seriously interfere with each other, and in apportioning between all an inadequate fund. It is, therefore, in no sense an act in which a Court is authorized to interfere with an executive officer. Much less is it so, when the effect of such interference must be to require a revision of decisions previously made in the most deliberate manner, and to oblige every incumbent of an office, already laborious, to investigate and open anew, without the exhibition of additional facts, subjects that have been already fully and finally decided.

2. But if the act which the Secretary of the Navy is required to perform were ministerial, and such as a Court having competent jurisdiction might compel him to perform; it is yet submitted, that upon the merits the applicant would not be entitled to the relief prayed for. Mrs. Decatur had no right to claim payment under the resolution, having received it under the general law.

To make such a double payment out of the navy pension fund, would be a violation of the trust created in the establishment of that fund. It was not raised by Congress; it was taken from the sale of prizes captured by the naval officers and seamen. By what right, on what principle of justice can the widow of one officer receive from that fund twice as much as another? Congress never designed so to violate the principles of justice, or so to appropriate any portion of a fund raised by the services and gallantry of the whole navy. That they could not, is strikingly shown in the instance of their gratuity to the widow of Commodore Perry; she was entitled to her pension from this fund; but when Congress resolved, under circumstances of strong sympathy, to add to her compensation, they gave her an annuity "payable out of the treasury;" not a double pension, to be taken from the navy pension fund, to the detriment of those to whom it belonged, according to the terms of the original trust. 6 Laws of the United States, 561.

It was evidently the intention of Congress to substitute the general for the special provision; to give to all the widows of the officers and seamen, the same relative gratuity; with this object, the special resolution in favour of Mrs. Decatur was withheld till the latest moment: it was only when it was found that a difference between the two Houses might prevent the passage of the general bill, at that session, that the special resolution in her behalf was adopted. This is evinced, by the identity of every provision in the two, except that which prolongs the pension during life. An intention so clearly exhibited must always prevail in construing a statute. Brown vs. Barry, 3 Dallas, 365. But were there a doubt as to the intention to abrogate the special provision by the general law, it would

[Decatur vs. Paulding.]

not sanction the assumption that Congress meant the latter to apply to the case of Mrs. Decatur, while the former continued in force. It would be more reasonable to suppose that her claim, having been separately presented, separately discussed, and separately legislated upon, any which she might have had under the general law was extinguished.

In the construction of statutes, where a general legislative provision embraces a special one, it is a substitute for, not an addition to it. The general provision embraces and controls the special one. This arises from two well established principles in regard to statutes: that all legislative provisions on the same subject are to be taken together; and that later regulations, if at variance with previous ones, are to control them. It is said by Lord Coke, (2 Inst. 13,) that earlier clauses in the same statute are to be restrained by those that are subsequent. Where an act provided for the place where treason, committed by particular persons, should be tried, and a subsequent act established the mode of all trials for treason, the latter was held to supersede the former. 11 Reports, 63. In Rex vs. Loxdale, 1 Burrows, 447, it is said, that all statutes relating to one subject are to be taken together. When the act of 5 Geo. 3, punished "seducing artificers" with three months' imprisonment, and that of 23 Geo. 3, with six months, the last was held to supersede the former; though there was no express repeal. Rex vs. Cator, 4 Burrows, 2026. In Williams vs. Pritchard, 4 Term Reports, 2, it is said, that a subsequent act controls a prior one on the same subject. In the Attorney General vs. Chelsea Waterworks, Fitzgibbon, 195, it is said, that the latter part of the same statute controls the former part. In Bywater vs. Branding, 7 Barn. and Cress. 643, it is said, that statutes are to be so construed as to give effect to the whole, not to separate clauses. In Gage vs. Currier, 4 Pickering, 399, where an act of 1793 gave limited privileges, as to church membership, to a particular town, and an act of 1823 gave general privileges on the same subject to the whole state, the latter was held to supersede the former. Applying these principles, we must admit, that where a pension to the widow of a deceased officer is given, and subsequently thereto a pension is allowed to all such widows, including by its terms the one for whom the special act was passed, it is to be taken as one general provision.

It is held, that the same rules should govern the construction of statutes as of wills. Butler and Baker's case, 3 Reports, 27. Attorney General vs. Chelsea Waterworks, Fitzgibbon, 195. If so, the principle contended for is clearly established. It cannot be doubted that if, in a will, an annuity for five years, of a specific sum, payable out of a specific fund, were bequeathed to the plaintiff in error, and shortly afterwards, by a codicil, an annuity in all respects similar, except that it was to last for life, were bequeathed to a class of persons of whom the plaintiff was necessarily one, that the latter would be regarded, not as an addition to, but a substitute for the former. In St. Albans vs. Beauclerk, 2 Atkyns, 638, where the same sum

was given to the same person in two codicils, it was held to be but one legacy; and that even a greater sum to the same person is only an augmentation, not a second legacy. In James vs. Semmes, 2 H. Blackstone, 213, an annuity of the same sum to the same person, in a will, and afterwards in a codicil, was held to be but one, because made chargeable on the same fund. In Allen vs. Callow, 3 Vesey, 289, a legacy was given to a child named, and by a codicil the same sum to the children generally; and it was held to be a mere repetition. In Osborn vs. Leeds, 5 Vesey, 384, a legacy to children generally, and a codicil giving the same sum to a particular child, was held to be merely a repetition. In Dewitt vs. Yates, 10 Johnson's Reports, 158, a legacy to a granddaughter, and afterwards one of the same sum to the same person, but payable by a different legatee, was held to be only a substitution. None of these cases are so strongly indicative of the intention to substitute the last for the first provision, as that of Mrs. Decatur.

But if the first provision be not superseded, is it not expressly repealed by the last? The general act provides that the navy pension fund shall be distributed in a certain manner, and no other; it then repeals all other laws at variance with it. Is not the special act therefore repealed? Even if not superseded or repealed, does not the well established principle apply, that where two modes are given to recover the same thing, one must be chosen? Co. Litt. 145.

On these several grounds it is submitted, that the plaintiff in error, having received her pension under one law, cannot claim it under the other, for which the former was only a substitute. Even if both were passed intentionally; if Congress on the same day knowingly passed two distinct acts, relating to the payment of a widow's pension out of the navy pension fund, they can be regarded only as two sections of a single law; the one providing for the person named, the other for all widows. How would the clauses be considered in such a case? The most favourable construction would be, that Mrs. Decatur might take under either—might claim her right to select; that she was to have a special benefit, if she chose under the one section, not being required to offer any evidence to sustain her claim, as others were obliged to do; or that she was to have her pension for life, if she preferred to waive that benefit. The special clause excepted her from the general provisions imposed on all other persons. Rex vs. Armagh, 8 Modern, 8. Churchill vs. Crease, 5 Bingham, 180. Torrington vs. Hargraves, 5 Bingham, 492.

3. But again: the Circuit Court was right in refusing the mandamus, because it asked for the payment of a sum under the resolution, which the resolution did not warrant. The plaintiff in error asked a mandamus to compel the Secretary of the Navy to pay her the full and entire amount of the sums of money stated in her petition, which were one-half of the monthly pay of her husband, and also one-half of the daily rations to which he was entitled. The resolution gives her a pension "in conformity with the provisions of the act concerning naval pensions and the navy pension fund,

passed 30th June, 1834," (4 Story's Laws, 2385;) and also, "the arrearages of the half-pay of a post captain." No. authority or reason for including the daily rations—the subsistence of an officer or seaman, in his pay, can be shown either by statute or usage. Uniform construction, from the beginning of the government, has excluded them. This exposition of the law is so strong that a Court of justice would now scarcely change it, even if the language admitted of doubt. 1 Dallas, 136. 178, 179. The whole current of legislation shows that they are considered as distinct. 1 Story's Laws, 321. 502. 514. 2 Story's Laws, 830. 1090. 1210. 3 Story's Laws, 1810. And in the case of Parker *vs.* The United States, 1 Peters, 297, it evidently appears that this Court regarded the rations of an officer as distinct from his pay.

On these grounds it is submitted, that it was no error in the Circuit Court to refuse the mandamus which was prayed for. The act of the Secretary of the Navy, which it was sought to compel, was not such as that tribunal had a right to control; and if it had been, the payment already received by the plaintiff in error appears to have been all that Congress intended her to have, by virtue of the resolution on which she relied. That the generous liberality of the legislature might be justly extended to reward the gallant services of the brave and lamented Decatur, no one can doubt; but it is not to be supposed that they desired to effect that object, by an unequal charge upon a fund collected by the gallantry and intended for the benefit of the officers and seamen of the navy in general.

Mr. Chief Justice TANEY delivered the opinion of the Court.

This case is brought here by a writ of error, from the judgment of the Circuit Court of the United States for the District of Columbia, refusing to award a peremptory mandamus.

The material facts in the case are as follow: By an act of Congress, passed on the 3d of March, 1837, the widow of any officer who died in the naval service, became entitled to receive out of the navy pension fund half the monthly pay to which the deceased officer would have been entitled, under the acts regulating the pay of the navy, in force on the 1st day of January, 1835; the half-pay to commence from the time of the death of such officer; and upon the death or intermarriage of such widow, to go to the child or children of the officer.

On the same day the following resolution was passed by Congress:

No. 2. Resolution granting a pension to Susan Decatur, widow of the late Stephen Decatur.

Resolved, by the Senate and House of Representatives of the United States of America in Congress assembled, That Mrs. Susan Decatur, widow of the late Commodore Stephen Decatur, be paid from the navy pension fund, a pension for five years, commencing from the thirtieth day of June, eighteen hundred and thirty-four, in conformity with the provisions of the act concerning naval pensions

65

and the navy pension fund, passed the thirtieth June, eighteen hundred and thirty-four; and that she be allowed, from said fund, the arrearages of the half-pay of a post captain, from the death of Commodore Decatur to the thirtieth of June, eighteen hundred and thirty-four, together with the pension hereby allowed her; and that the arrearage of said pension be vested in the Secretary of the Treasury, in trust for the use of the said Susan Decatur: provided that the said pension shall cease on the death or marriage of the said Susan Decatur.

Approved, March 3, 1837.

By the act of Congress of July 10th, 1832, the Secretary of the Navy is constituted the trustee of the navy pension fund; and as such it is made his duty to grant and pay the pensions, according to the terms of the acts of Congress.

After the passage of the law and resolution of March 3d, 1837, Mrs. Susan Decatur, the widow of Commodore Decatur, applied to Mahlon Dickerson, then Secretary of the Navy, to be allowed the half-pay to which she was entitled under the general law above mentioned; and also the pension and arrearages of half-pay specially provided for her by the resolution passed on the same day.

The Secretary of the Navy, it appears, doubted whether she was entitled to both, and referred the matter to the Attorney General; who gave it as his opinion that Mrs. Decatur was not entitled to both, but that she might take under either, at her election. The Secretary thereupon informed her of the opinion of the Attorney General, offering at the same time to pay her under the law, or the resolution, as she might prefer. Mrs. Decatur elected to receive under the law; but it is admitted by the counsel on both sides that she did not acquiesce in this decision, but protested against it; and by consenting to receive the amount paid her, she did not mean to waive any right she might have to the residue.

Some time afterwards, Mr. Dickerson retired from the office of Secretary of the Navy, and was succeeded by Mr. Paulding, the defendant in this writ of error; and in the fall of 1838 Mrs. Decatur applied to him to revise the decision of his predecessor, and to allow her the pension provided by the resolution. The Secretary declined doing so; whereupon Mrs. Decatur applied to the Circuit Court for Washington County, in the District of Columbia, for a mandamus to compel him to pay the amount she supposed to be due to her. A rule to show cause was granted by the Court; and upon a return made by him, stating, among other things, the facts above mentioned, the Court refused the application for a peremptory mandamus. It is this decision we are now called on to revise.

In the case of Kendall vs. The United States, 12 Peters, 524, it was decided in this Court, that the Circuit Court for Washington county in the District of Columbia, has the power to issue a mandamus to an officer of the federal government, commanding him to do a ministerial act. The first question, therefore, to be consi-

dered in this case is, whether the duty imposed upon the Secretary of the Navy, by the resolution in favour of Mrs. Decatur, was a mere ministerial act.

The duty required by the resolution was to be performed by him as the head of one of the executive departments of the government, in the ordinary discharge of his official duties. In general, such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress, under which he is from time to time required to act. If he doubts, he has a right to call on the Attorney General to assist him with his counsel; and it would be difficult to imagine why a legal adviser was provided by law for the heads of departments, as well as for the President, unless their duties were regarded as executive in which judgment and discretion were to be exercised.

If a suit should come before this Court, which involved the construction of any of these laws, the Court certainly would not be bound to adopt the construction given by the head of a department. And if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But their judgment upon the construction of a law must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the act of Congress, in order to ascertain the rights of the parties in the cause before them. The Court could not entertain an appeal from the decision of one of the Secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion, or judgment. Nor can it by mandamus, act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties.

The case before us illustrates these principles, and shows the difference between executive duties and ministerial acts. The claim of Mrs. Decatur having been acted upon by his predecessor in office, the Secretary was obliged to determine whether it was proper to revise that decision. If he had determined to revise it, he must have exercised his judgment upon the construction of the law and the resolution, and have made up his mind whether she was entitled under one only, or under both. And if he determined that she was entitled under the resolution as well as the law, he must then have again exercised his judgment, in deciding whether the half-pay allowed her was to be calculated by the pay proper, or the pay and emoluments of an officer of the Commodore's rank. And after all this was done, he must have inquired into the condition of the navy pension fund, and the claims upon it, in order to ascertain whether there was money enough to pay all the demands upon it; and if not money enough, how it was to be apportioned among the parties entitled. A resolution of Congress, requiring the exercise of so

much judgment and investigation, can, with no propriety, be said to command a mere ministerial act to be done by the Secretary.

The interference of the Courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied that such a power was never intended to be given to them. Upon the very subject before us, the interposition of the Courts might throw the pension fund, and the whole subject of pensions, into the greatest confusion and disorder. It is understood from the Secretary's return to the mandamus, that in allowing the half-pay, it has always been calculated by the pay proper; and that the rations or emoluments to which the officer was entitled, have never been brought into the calculation. Suppose the Court had deemed the act required by the resolution in question a fit subject for a mandamus, and, in expounding it, had determined that the rations and emoluments of the officer were to be considered in calculating the half-pay? We can readily imagine the confusion and disorder into which such a decision would throw the whole subject of pensions and half-pay; which now forms so large a portion of the annual expenditure of the government, and is distributed among such a multitude of individuals.

The doctrines which this Court now hold in relation to the executive departments of the government, are the same that were distinctly announced in the case of Kendall vs. The United States, 12 Peters, 524. In page 610 of that opinion, the Court say, " We do not think the proceedings in this case interferes in any respect whatever with the rights or duties of the executive, or that it involves any conflict of powers between the executive and judicial departments of the government. The mandamus does not seek to direct or control the Postmaster-general in the discharge of any official duty, partaking in any respect of an executive character; but to enforce the performance of a mere ministerial act, which neither he nor the President had any authority to deny or control."

And in page 614, the Court still more strongly state the mere ministerial character of the act required to be done in that case, and distinguish it from official acts of the head of a department, where judgment and discretion are to be exercised. The Court there say, " He was simply required to give the credit. This was not an official act in any other sense than being a transaction in the department where the books and accounts were kept; and was an official act in the same sense that an entry in the minutes of a Court, pursuant to an order of the Court, is an official act. There is no room for the exercise of any discretion, official or otherwise; all that is shut out by the direct or positive command of the law, and the act required to be done is, in every just sense, a mere ministerial act."

We have referred to these passages in the opinion given by the Court in the case of Kendall vs. The United States, in order to show more clearly the distinction taken between a mere ministerial act, required to be done by the head of an executive department, and a

[Decatur *vs.* Paulding.]

duty imposed upon him in his official character as the head of such department, in which judgment and discretion are to be exercised. There was in that case a difference of opinion in the Court, in relation to the power of the Circuit Court to issue the mandamus. But there was no difference of opinion respecting the act to be done. The Court were unanimously of opinion, that in its character the act was merely ministerial. In the case before us, it is clearly otherwise; and the resolution in favour of Mrs. Decatur imposed a duty on the Secretary of the Navy, which required the exercise of judgment and discretion : and in such a case the Circuit Court had no right, by mandamus, to control his judgment; and guide him in the exercise of a discretion which the law had confided to him.

We are therefore of opinion, that the Circuit Court were not authorized by law to issue the mandamus, and committed no error in refusing it. And as we have no jurisdiction over the acts of the Secretary in this respect, we forbear to express any opinion upon the construction of the resolution in question.

The judgment of the Circuit Court, refusing to award a peremptory mandamus, must be affirmed.

Mr. Justice M‘LEAN.

The answer of the Secretary of the Navy to the rule to show cause why a mandamus should not issue, is conclusive; and I entirely concur with the decision of the Circuit Court, in refusing the writ. The relatrix having received a pension under the general law, is not entitled to receive one on the same ground, under the special law. My impression is, that Congress having acted upon her case and made a special provision, she cannot claim under the general law.

An individual applies to Congress for compensation for services rendered to the public, and a special provision is made for his relief. And if a law should be passed at the same session, making general provision for the payment of similar services, I should think that it could not be successfully contended, that such individual could claim under the general law. The merits of his claim having been considered and decided by Congress, he can only claim under the special provision made for him. But in the present case, the claimant having received under the general law as large, if not a larger benefaction, than was given under the special law, her right under the latter is extinguished.

I differ from a majority of the judges, who hold, that the construction of this resolution, giving to the relatrix a pension, is a duty, in the discharge of which, an executive discretion may be exercised. The law is directory and imperative, and admits of the exercise of no discretion, on the part of the Secretary. The amount of the half-pay pension given in the resolution, is fixed by law; and is, therefore, certain. I am authorized to say that my brother Story agrees with this view of the case.

Mr. Justice BALDWIN delivered an opinion to the reporter, after the adjournment of the Court; which will be found in the Appendix, No. I.

Mr. Justice CATRON.

Between the Circuit Court of this District, and the executive administration of the United States, there is an open contest for power. The Court claims jurisdiction to coerce by mandamus in all cases where an officer of the government of any grade refuses to perform a ministerial duty: and of necessity claims the right to determine, in every case, what is such duty; or whether it is an executive duty; when the power to coerce performance is not claimed. Where the line of demarkation lies, the Court reserves to itself the power to determine. Any sensible distinction applicable to all cases, it is impossible to lay down, as I think; such are the refinements, and mere verbal distinctions, as to leave an almost unlimited discretion to the Court. How easily the doctrine may be pushed and widened to any extent, this case furnishes an excellent illustration. The process of reasoning adopted by those who maintain the power to assume jurisdiction, is, that where a right exists by law to demand money of an officer, and he refuses to pay, the Court can enforce the right by mandamus; and to ascertain the existence of the right, it is the duty of the Court to construe the law: and if by such construction, the right is found, and the refusal to pay ascertained to have been a mistake; then the officer will be coerced to pay out the money, as a ministerial duty.

In most cases, (as in this,) the Court will be called on to try a contest only fit for an action of assumpsit. First, it must ascertain the existence of the right, from complicated facts, and the construction of doubtful laws: this found, the duty follows; it being a duty, it is for the Court to say whether it is clear; if so, being an ascertained duty, and clear, then coercion, of course, would follow.

What few cases of contested claims against the government would escape investigation, were these assumptions recognised, is free from doubt.

The great question, then, standing in advance of all others in this cause, and the only one I feel myself authorized to examine is the broad one, whether the Circuit Court of the District of Columbia, can, by a writ of mandamus, force one of the secretaries of the great departments, contrary to the opinion and commands of the President of the United States, to pay money out of the treasury? Mrs. Decatur claimed a double pension; a single one was paid by the Secretary of the Navy; she demanded the additional one, amounting to nearly twenty thousand dollars; the Secretary refused to pay it; she then memorialized the President, and he concurred with, and affirmed the decision of the Secretary, that the claim could not be allowed: and from this final decision of the executive department of the nation, Mrs. Decatur appealed in the form of a

[Decatur vs. Paulding.]

petition for a mandamus, to the Circuit Court of the District of Columbia, to reverse and annul the decision, made by the Secretary, and sanctioned by the President,

The Court assumed jurisdiction, compelled the United States, through the Secretary of the Navy, to file a long answer; and in a tedious lawsuit to defend the United States.   That he did so successfully, is of little consequence,; the evil lies not in the loss of eighteen thousand six hundred dollars to the government, but in the concession by this Court, that the Circuit Court of the District has the power to sit in judgment on the Secretary's decision; to reverse the same at its pleasure, and to order the money to be paid out of the treasury, contrary to his will; and to the will of the President, and that of all those intrusted by the Constitution and laws with the safe keeping of the public moneys.

Stripped of the slight disguise of legal forms, such is the case before us; the conflict between the executive and judiciary departments could not well be more direct, nor more dangerous.   The idea that they are distinct, and their duties separate, is confounded, if the jurisdiction of the Court below is sustained; placing the executive power at its mercy, in case of all contested claims.   Few can be more contested than the one before us; if jurisdiction can be exercised in this instance, it is difficult to see in what others it does not exist; to establish which, we will briefly recapitulate the leading facts.   On the 3d of March, 1837, a resolution was passed by Congress giving a pension of the half-pay of the late Captain Decatur, to the petitioner, his widow; and on the same day a bill passed, giving an equal pension to all the widows of naval officers, and seamen, who had died in the service: with this difference in the general law and the resolution, that by the former, the half-pay continued for life, and by the resolution only for five years, if the petitioner so long lived, and continued a widow.   She claims by her petition, not only the half-monthly pay proper of a post captain of the navy, but for daily rations, eight, at twenty-five cents each, amounting to one-half of seven hundred and thirty dollars per annum; and also interest on the sum withholden.   These claims for back rations and interest are contrary to the construction given by the government to the navy pension acts, for more than forty years.   To cover a failure, should the Court concur with the executive departments in rejecting these claims, the petition has a double aspect in the form of a bill in equity: first, praying for the whole sum of eighteen thousand five hundred and ninety-seven dollars; or such part or portion thereof as the Court may direct.

It was first called on to decide whether the United States owed the petitioner any thing; secondly, how much; and, thirdly, whether there was any money in the treasury belonging to the navy fund, out of which the claim could then be satisfied.

The Secretary answers, he had money enough of the fund at his control when he made the answer, if the old construction was adhered to by the Court; but if he was adjudged to pay the petitioner

for rations, and interest, then all other widows and orphans provided for by the various acts of Congress, and entitled to half-pay out of the fund, would likewise be entitled to come in for half rations and interest; in which case, he would not have money to pay the claim, but that the fund would be greatly in arrear. A more complicated and difficult lawsuit than is found in this cause, rarely comes before a Court of justice; and to be compelled to defend which the Secretary protests; " Because such jurisdiction in this Court would, if assumed, operate as such an interference with the discharge of the official duties of the undersigned, as to make it impossible for him to perform them as required and intended; and would transfer to the said Court the discharge of the said duties, and the whole management and disposition of the said fund; and subject all applicants for pensions to the delay, expense, and embarrassments of legal controversies as to their rights, and to a suspension of the provisions to which they might be entitled under the laws, till these controversies were judicially decided.

" Because such a jurisdiction in the Circuit Court would make the United States sueable in that Court; and subject the money of the United States, in the treasury of the United States, to be taken therefrom by the judgments of said Court.

" Because, if the Circuit Court assumes the jurisdiction of compelling the Secretary of the Navy, or the head of any other department to revise and reverse the decisions that may have been made by their predecessors in office; these officers will necessarily be taken off from the discharge of their immediate and most urgent public duties, and made to apply their time and attention, and that of the clerks in the departments, in an endless review and reconsideration of antiquated claims and settled questions; to the delay and hinderance of measures of vital importance to the national welfare and safety.

" For these and other reasons which he trusts will be obvious, on further consideration to the Court, he respectfully objects to the jurisdiction assumed in this case; and will now proceed, under such protest, to show cause why the mandamus prayed for should not be issued."

He was, however, compelled to defend the suit, and defeated the claim upon its merits; the discussion of which took up two days in this Court.

But the great question was decided below, that the Court have jurisdiction and power to order money to be paid out of the Treasury of the United States, by a writ in the nature of an execution, running in the name of the United States, commanding the government to obey its own authority. This prominent feature of the writ demanded, it is impossible to disguise. That no other Federal Circuit Court in the Union has power to issue such a writ, was recognised as settled in the case of Stockton and Stokes *vs.* The Postmaster-general, by this Court, in 1838. The power claimed is confined to this ten miles square. And what is the extent of the

[Decatur *vs.* Paulding.]

power ?  To overrule the decisions of the five great departments and of the President, extending to the payment of money, the delivery of commissions, and innumerable other matters involved in the complicated operations of this government, amounting each year to a hundred thousand separate transactions, to say the least: the validity of all debateable-and contested claims are holden to be subjected to the ordeal, and, on their rejection, to the supervision of the Circuit Court of this District.  Beyond doubt, this is the breadth of the assumption of jurisdiction put forth by the cause before us.  The entertaining such a cause is calculated to alarm all men who seriously think of the consequences.  It is an invitation to all needy expectants, with pretensions of claim on the government, to seek this superior and controlling power, (the Circuit Court of this District,) and invoke its aid to force their hands into the treasury, contrary to the better judgment of the guardians of the public money. Thousands of claims exist, quite as fair on their face, and as simple in their details, as is this of Mrs. Decatur's, that have been rejected. She has been allowed to appeal to the Court, and been heard; and so can all others.  The assumption of powers need not be pushed further, to let suitors enough into the Court to consume the time and absorb the attention of the secretaries; a principal business of theirs presently must be, to sit at the bar of the Court to ward off its mandate, and keep its officers from forcing the money out of the public treasury; unless this Court arrests the attempt: whether well or ill intended, is aside from the purpose; the assumption and exercise of the power, is equally poisonous in its consequences to the country: it takes from the hands of those the administration of public affairs, that the laws and the people of this nation have intrusted with them; it brings to the bar of the Court, the nation itself; for it cannot be denied, that the United States government is the real defendant in this cause; and that if it was cast, it would be forced, (on this cause being remanded for execution,) to open the treasury according to the dictates of the Circuit Court.

The origin of the opinion that the public money could be reached through such instrumentality is of recent date; its history will be found in the case of Stockton and Stokes *vs.* The Postmaster-general. Money was not there asked in a direct form; and the Court put the case upon the express ground that the defendant "was not called upon to furnish the means of paying any balance that was awarded against the department by the solicitor of the treasury.  He was simply, (say the Court,) required to give the credit;" and this was no more an official act, than the making of an entry by a clerk, by order of a Court of justice : it was, in every just sense, a mere ministerial act. 12 Peters, 614.  Had it not been placed on this narrow ground, the decision could not have been made.  That it falls short of this case, is admitted; still, it was then manifest, that the attempt to push the doctrine of ministerial duties further, so as to reach the money in the treasury, would follow ; the case has occurred, and must be met.

2 x 2  66

_I maintain that the executive power of this nation, headed by the President, and divided into departments in its administration of the finances of the country, acts independently of the Courts of justice in paying the public creditors; and that the decision of the Secretary of the Navy in this case, affirmed by the President, under the advice of the Attorney General, was final on the laws as they stood; and that the petitioner could only appeal to Congress.

And here it may be safely asked whether the Secretary and President, the latter elected by the nation and responsible to the people directly, and to their representatives in Congress, each exercising an undoubtedly legitimate authority, were not the safest and best to decide on the rights of the nation, and of the petitioner seeking justice at its hands? Is the country known, that submits the administration of its finances to the Courts of justice, or permits them to control the operations of the treasury? What guarantee have the people of this country that the Circuit Court of this District, will as faithfully perform the functions they have assumed, when dealing out the public money to satisfy rejected claims, as the heads of the departments? The Court is wholly irresponsible to the people for its acts; is unknown to them; the judges hold appointments of an ordinary judicial character; and are accidentally exercising jurisdiction over the territory where the treasury and public officers are located. Furthermore, for nearly forty years this fearful claim to power has neither been exerted, nor was it supposed to exist; but now that it is assumed, we are struck with the peculiar impropriety of the Circuit Court of this District becoming the front of opposition to the executive administration.

Every government is deemed to be just to its citizens; its executive officers, equally with the judges of the Courts, are personally disinterested; and why should not their decisions be as satisfactory and final. They must be final, in most instances, in the nature of things, and the necessities of the government. Money is appropriated for certain objects; none can be drawn from the treasury save according to some law; of the obligations, the departments must judge in a prompt manner; they cannot await years of litigation to learn their duties, and the responsibilities of the governments from the Courts; the Secretary of the Navy could not subject to wants and miseries the whole of the widows and orphans on the navy pension list, until he was informed by the Court of this District, whether Mrs. Decatur should be paid her claim for rations and interest; he had to proceed, as for forty years and more his predecessors had done, and pay out upon the old construction; nor could the government submit to its alteration, for the arrearages would have exhausted the fund, possibly for the next ten years, and left most of the widows and orphans dependent upon it for daily bread, in utter destitution. To permit an interference of the Courts of justice with the accounts and affairs of the treasury, would soon sap its very foundations; money would not be drawn out according to its own rules, nor could the Secretary of the Treasury ever inform

[Decatur *vs.* Paulding.]

Congress of the amount needed.   Congress would, of necessity, be compelled to consult the Court, not the Secretary, when making appropriations.   This case again furnishes the illustration: if the Courts were to hold that Mrs. Decatur should be paid the eighteen thousand five hundred and ninety-seven dollars, and that the true construction of the acts of Congress was, that the widows and orphans pensioned on the navy fund should receive, in addition to the half-monthly pay, half rations, and interest on the arrearages; then an addition of, possibly, a million to the fund would be required.

For these and other reasons, the Court below had no jurisdiction of the subject matter; and, of course, no authority to issue the mandamus to bring the Secretary before it: and therefore I hold the suit must be dismissed, and the judgment affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the county of Washington, and was argued by counsel.   On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed.