Mr. Justice Humphreys
delivered the opinion of the court:
The petitioner asks this court for a writ of mandamus to compel the Seeretaiy of the Treasury of the United States to draw his warrant on the Treasurer for $8,200 in favor of the petitioner, the same being a sum of money for which the Secretary of War made requisition on the Secretary of the Treasury, to be paid out of the funds appropriated to the sup *176 port of the War Department; but there has been uo specific appropriation for this particular claim.
The nature and character of the writ presupposes, before its issuance, a final, definite judicial determination in favor of the party applying, leaving nothing to be investigated to establish the correctness and justice of petitioner’s right of redress. (6 Bacon Abr., 418.)
In Reeside v. Walker, 11 Howard, 272, the Circuit Court of this District declined to issue a mandamus to the Secretary of the Treasury to pay over money, and the Supreme Court affirmed the judgment.
The duty and office of the Secretary of the Treasury in drawing warrants, except in instances specified, defined, and already ascertained by direct act of Congress, can scarcely be said to be purely ministerial, leaving no judgment to be exercised, and stripping him of all discretion.
There is no other head of any other department who is responsible for the orders which draw the money directly from the Treasury. Nor can he legally draw any therefrom except in pursuance of appropriation made. If he mistakes, and supposes that an appropriation has been made, when, in fact, he has wrongly construed the act of Congress on that subject, he would be liable and answerable for such mistake. Hence there is necessarily a discretion of judgment to be exercised by him even in these instances. And so the Supreme Court determined in Decatur v. Paulding, 14 Peters, 497. Chief Justice Taney delivered the opinion of the court in that case, and on the subject of the functions of the heads of the departments said:
“In general, such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress under which he' is required to act.”
*177 The same general principles were stated by the court, Justice Miller delivering the opinion, in Gaines v. Thompson, 7 Wallace, both as to injunction and mandamus. The case of Kendall v. The United States, 12 Peters, taken and considered with subsequent expositions, eliminations, and expurgations by the same tribunal, may be relied upon as the received doctrine, and as defining the class of cases where the court will take jurisdiction and where decline. Subsequent rulings reduce the determination in the case of Kendall to the following limited compass:
“The act required to be done by the Postmaster-General is simply to credit the relatoi’s with the full amount of the award of the Solicitor. This is a precise, definite act, purely ministerial, and about which the Postmaster-General had no discretion whatever. This was not an official act in auy other sense than being a transaction in the department where the books and accounts were kept, and was an official act in the same sense that an entry in the minutes of a court, pursuant to an order of the court, is an official act. There is no room for the exercise of any discretion, official or otherwise.”
This was the language used by the court in Kendall’s case, and it has since been stated by the court to have been the ground on which the jurisdiction was placed. In Marbury v. Madison, Chief Justice Marshall said:
“It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to. be-determined.”
Has any act of Congress authorized any one else, any offir cer, high or low, than the Secretary of the Treasury, to- draw money from the Treasury? Can any court order money to be drawn therefrom? Has any act of Congress conferred upon any court the power to order it ? Courts may, in proper cases, determine that a claim exists against the government, but there the power of the courts over the store-house of the nation ceases. But can the mandate of this body be legally issued to the custodian of the warrants of the government *178 requiring him to respond to the requisition of the head of another department of the government, and, willing or unwilling, in accordance with his judgment or against his judgment, require him to pay up ? Or has the Secretary of the Treasury any discretion left, or any judgment to exercise in the performance of this duty ? Is the act or are the acts of Congress imperative, direct, and explicit in the case; and is nothing left but to do this or be answerable to the court ? If not, the writ should issue; if something else is left, and can reasonably be done, then the writ should not issue. The petitioner may appeal to Congress, because this is an alleged claim against the government. If it is just, that power will order it paid; if not, it must fail. The money will still be in the Treasury; if taken out now by our order, it will never find its way back. Let us look more closely into the case of Marbury v. Madison, and see to what point the rights of the petitioner had arrived. The President had nominated, the ¡Senate had advised and consented to the appointment, commissions' had been signed in due form by the President, and the seal of the United States had been affixed to the said commissions by the Secretary of State, and now nothing remained but to deliver them. The whole question had passed from the control of the executive department; neither the President nor any bead of a department had any longer any control over the subject at all; the right had, as the court determined, vested. The question could not be reviewed by the President himself, nor by any head of any department. The ground could not be gone over; the determination was abso: lute and final, and irrevocable. Have the relations of the executive departments and their duties, and the judicial depai’tment and its control, been changed or altered by any act of Congress ?
We think they have not. The act of Juue 25, 1868, (15 Stats., 76,) does not change the relation of any other department to the judicial, nor does it enlarge the jurisdiction of the courts of law or equity. Then we must fall back upon the line long since established and marked out for the judi *179 cial branch, else we throw the whole force of the government into confusion by collision of different branches. The act of Congress of the United States of June 25,1888, was intended and designed — as it expressly provides — to regulate the action of heads of departments in their intercourse with the Court of Claims, and it goes no further. What does the act of Congress of March 30, 1868, accomplish or require to be done? It explains, interprets, and directs that the act of March 3, 1817, shall not be taken “to authorize the heads of departments to change or modify the balances that may be certified to them by the Commissioner of Customs or the Comptroller of the Treasuiy, but that such balances, when stated by tbe auditor,” &c., shall “be subject to revision 'only by Congress or the proper courts.” Now, pause to see where the court itself stands in the face of this act, in the exercise of the power, legally, to issue the writ of mandamus. This writ must not be calle”d into requisition if any other proceedings can be had. But here is an express provision that the matter of revision may be had by “ Congress or the proper courts.” In the case of Kendall, Congress, the last resort, the final arbiter within its constitutional limits, had acted, had specifically directed a certain, definite piece of clerical, ministerial work to be done — no doubt of the construction of what was required; and what was required to be done by the act was within the bounds and limits of the constitutional powers of the legislative department. Had Congress transcended constitutional bounds, the court could have controlled its action. The act of July 28, 1866, section 8, (14 Stats, at Large, 327,) amends section 4 of act of March 3,1849, by providing: “That the said auditor shall in all cases transmit his adjustment, with all the papers relating thereto, to the Second Comptroller for his revision and decision thereon, the same in all respects as is provided in the act of the 2d of September, 1789.” What was the act of March 3, 1849 ? (9 Stats, at Large, 414.) It was “ an act to provide for the payment of horses and other property lost or destroyed in the military service of the United States.” This act had been amended *180 on March 3, 1863, in section 2, by providing by section 5: “That section 2 of the act of 1849 should be construed to include steamboats and other vessels, &c., in the property to be allowed and paid for when destroyed and lost under the circumstances provided for in said act.” The act of 1849, amended as stated, provided in the second section for the payment of property lost or destroyed in the service of the United States, “ except in cases where the risk to which the property would be exposed was agreed to be incurred by the ' owner.” The third section of said act provides that such claims shall be adjusted by the Third Auditor, under such rules as shall be prescribed by the Secretary of War. The claim in controversy grows out of an alleged destruction of a steamboat or tug, and the Third Auditor of the Treasury allowed the claim, after adjustment, and transmitted the same to the Second Comptroller of the Treasury, which was adjusted and allowed by him; and being approved by the Secretary of War, a request was made by the said Secretary of War to the respondent, the Secretary of the Treasury, to draw his warrant for $8,200 in favor of petitioner.
The Secretary of the Treasury refused to draw his warrant on the ground that, in his opinion, the United States was not bound to' pay, under the contract with the owner, for the vessel or steam-tug, she having been destroyed by fire, the risk of which, the Secretary alleges, the owner took upon himself — that being the contract as evidenced by the charter-party of affreightment.
It may be broadly asserted and legally maintained that it does not rest within the jurisdiction of any court by any process to compel the Secretary of the Treasury to draw money from the Treasury, nor to compel him to draw his •warrant in'favor of any one, nor to sign the same and deliver" it to any one, for a controverted claim.
The second section of the act of September 2,1789, entitled “An act to establish the Treasury Department,” contains this clause:
“That it shall be the duty of the Secretary of the Treasury *181 * * * to decide oil the forms of keeping and stating accounts and making returns, and to grant, under the limitations herein established, or to be hereafter provided, all war-x’ants for moneys to be issued from the Treasury in pursuance of appropriations by law.” •
The Constitution has carefully confined the power over all the property of the government in the legislative department, and the legislative department has attached to the office of the Treasury the entire custody of the moneys of the government, and has confided to the Secretary thereof in his offirial capacity the sole power to draw warrants, not as a ministerial act, but as an officer of the government in his official capacity, and has intrusted to his judgment and discretion when and in what sums to draw; for he could draw upon New York, New Orleans, and San Francisco to liquidate claims in favor of the same individual. The necessities of the government might require this to be done.
He is expected so to use his judgment and discretion in drawing those warrants as that the credit of the government shall not suffer, and he must be left free of the mandates of any but the legislative department. In the case of Decatur v. Paulding, 14 Pet., Chief Justice Taney says:
“Now, can the court, by mandamus, act directly upon the officer and guide and control his judgment or discretion in the matters committed to his care in the ordinary exercise of his official duties? * ■* * The interference of the court with the performance of the ordinary duties of the executive departments would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given to them.”
This language was quoted and approved by the court in the case of Gaines v. Thompson, already cited.
It is difficult to conceive of an official duty depending upon discretion and judgment more than that of drawing warrants upon the Treasury, and of the proper adjustment and distribution of the moneys in the Treasury, the disposal of which has been very wisely reserved to the power that raises that money, *182 and to the special officers to distribute it uuder the sole supervision of that power. It is to be perceived that whenever the legislative department shall see that the interest of the country and the rights of individual citizens demand the aid of the courts to control the Treasury, the jurisdiction of those courts will be extended. We think that it would be profitable to examine, as a legal question, into the principles enunciated in the opinion of the learned judge who delivered the opinion in the ease of Brashear v. Mason, 6 How. Mr. Justice Nelson delivered a well-considered opinion in that case, and an extract or two from the same will exhibit the reason why a court cannot enter the Treasury by its order:
“ Formerly, the moneys appropriated for the War and Navy Departments were placed in the Treasury to the credit of the respective secretaries. That practice has been changed, and all the moneys in the Treasury are iu 'to the credit or in the custody of the Treasurer, and can be drawn out, as we have seen, only on the warrant of the Secretary of the Treasury, countersigned by the Comptroller. It will not do to say that the result of the procediug by mandamus would show the title of the relator to his pay, the amount, and whether there were any moneys in the Treasury applicable to the demand; for, upon this ground, any creditor of the government would be enabled to enforce his claim against it, through the head of the proper department, by means of this writ, and the proceeding by mandamus would become as common in the enforcement of demands upon the government as the action of assumpsit to enforce like demands against individuals.”
In the case of United States v. Guthrie, 17 How., the court uses this language:
“ Whether, under the organization of the Federal government, or by any principle of law, there can be asserted a power in the Circuit Court of the Hnitéd States for the District of Columbia, or in this court, to command the withdrawal of a sum or sums of money from the Treasury of the Hnited States, to be applied in satisfaction of disputed or controverted claims *183 against the United States? * * * It would occur to every mind that a treasury not fenced round or shielded by fixed and established modes and rules of administration, but which could be subjected to any number or description of demands, asserted and sustained through the undefined and undefinable discretion of the courts, would constitute a feeble and inadequate provision for the great and inevitable necessities of the nation. The government, under such a regime, or, rather, under such an absence of all rule, would, if practicable at all, be administered, not by the great departments ordained by the Constitution and laws, and guided by the modes therein prescribed, but by the uncertain and, perhaps, contradictory action of the courts in the enforcement of their views of private interest.”
Mr. Justice Dauiel delivered the opinion of the court in 'the case just cited, and in the opinion Chief Justice Taney, Justices Wayne and Catron concurred; while Justices Curtis, Nelson, Grier, and Campbell assented to the judgment denying a mandamus against the Secretary of the Treasury, but expressed no opinion on the views quoted, and Mr. Justice McLean dissented from the opinion and judgment and delivered a separate opinion. Whilst the five learned justices had their doubts as to the propriety of announcing an adjudication abandoning all jurisdiction by the courts to interfere with the executive departments acting in their official capacity, yet four of them did not dissent from the views of their four learned brethren. The case of Guthrie went up from the Circuit Court of this District, by which court the application for mandamus had been overruled, aud was decided by the Supreme Court at the December Term, 1854. The case of United States v. Seaman, 17 How., declares the law to be that the writ of mandamus cannot issue where any discretion and judgment are to be exercised. The history of our country in these subsequent years has fully exhibited the wisdom of the different branches of our government being left untrammeled by any interference on the part of another branch. The excellence of our system may consist greatly in the strict *184 observance of each branch adhering to its own peculiar limits and bounds, thereby preserving the law of harmony and the harmony of law and order. . The motion for the writ is overruled and discharged.