DowNey, Judge,
dissenting:
It it not necessary in this opinion expressing a contrary view of the case that the facts be restated except as may be required in the course of the discussion.
■ Proceeding at once to the required construction of the legislative provision in question I agree with the conclusion reached as to the construction to be put on the word “ author-' ized ” and that it does not imply a discretion to act or not to act as the Postmaster General may see fit but imposes a duty. It does not follow, however, that there remains no discretion as to his official action in the discharge of that duty. Even though there may be no discretion as between action and non-action there may still remain a discretion as to the action itself and a discretion which when honestly exercised without evidence of abuse or bad faith may not be reviewed.
It has been frequently held that the proper courts may by mandate direct the performance of a purely ministerial duty. Contra, where the effect is to direct or control the head of an executive department in the discharge of an executive duty involving the exercise of judgment or discretion. Redfield v. Windom, 137 U. S., 636, and cases cited.
In the case of United States ex rel Dunlap v. Black, 128 U. S., 40-48, the Supreme Court said:
“ The court will not interfere by mandamus with the executive officers of the Government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the court having no appellate power for that purpose; but when they refuse to act in a ease at all [italics ours] or when, by special statute or otherwise, a mere ministerial duty is imposed upon them, that is, a serv *362 ice which they are bound to perform without further question, then, if they refuse, a mandamus may be issued to compel them.
“ Judged by this rule the present case presents no difficulties. The Commissioner of Pensions did not refuse to acb or decide. He did act and decide * *
In Huidekoper v. Hadley, 177 Fed. Rep., 1-9, it is said:
“ The rule is also well settled that, although the exercise of discretion will not be controlled by mandamus, yet the writ will lie to compel the person or body in whom the discretion is lodged to proceed to its exercise.”
The citations are not for the purpose of attempting to control this case in any degree by the law of mandate but for the purpose of showing a recognition of the principle that there may be a nondiscretionary duty to act and still remain a discretion as to the action to be taken. And applying that principle we are but on the threshold of the case when we conclude that the word “ authorized ” is to be construed as “ directed ” and that conclusion is of force only for its own purposes, of no real importance since the Postmaster General did act, and can in no way affect the question as to whether he had a discretion in the manner of his action.
The Postmaster General is the head of an executive department. With reference to the duties generally of such officers the Supreme Court, in Decatur v. Paulding, 14 Peters, 497, said:
“ In general, such duties, whether imposed by act of Congress or by resolution, are not ministerial duties. The head of an executive department of the Government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress, under which he is from time to time required to act. If he doubts, he has a right to call on the Attorney General to assist him with his counsel; and it would be difficult to imagine why a legal adviser was provided by law for the heads of departments, as well as for the President, unless their duties were regarded as executive, in which judgment and discretion were to be exercised.”
It of course does not follow that purely ministerial duties involving no discretion may not be imposed on heads of executive departments. Indeed, the Supreme Court has held *363 in at least one case that the duties there under discussion which were imposed on the Postmaster General were purely ministerial, a mere matter of bookkeeping. But it seems to me quite in consonance with our general scheme to entertain the view primarily and generally that duties imposed on heads of executive departments are executive duties and not ministerial, and to entertain that view to the extent that in determining, in a given case, involving any element of doubt, the nature of the duties imposed we are to consider them in the light of the broad interpretation of the duties of such officers, and if it does not with reasonable certainty appear that it was the intention of Congress to impose a purely ministerial duty, devoid of any discretion, the presumption must be that to the extent that the question is left open or in doubt the intention was but to impose another duty to be discharged within the broad rule applicable generally to the duties of such executive officers. Otherwise put, I think it may be said that in a case involving doubt as to the character of the duties imposed we may properly consider the powers and duties generally of the officer on whom they are imposed. Lest I be misunderstood at this point I may here say that I do not regard the question in this case as possessing any considerable element of doubt. The views above as to the duties generally of a head of an executive department are intended to carry with them such weight as they may be entitled to in reaching a final conclusion. It may not be inappropriate to add that aside from his general discretion as an executive officer Congress has so frequently as to almost establish a practice placed within the discretion of the Postmaster General important matters in connection with the Postal Service.
Assuming then the correctness of the conclusion that Congress did not intend by the use of the word “ authorized ” to leave it to the Postmaster General, in his discretion, to act or not act at all in the matter as he might see fit, we must determine whether in the action to be taken he was simply to apply a 5 per cent increase to all compensations paid for railway mail transportation, a mere matter of simple mathematics, a purely administrative duty, or whether he had some discretion in the bestowal of the increases.
*364 The language of the act is not exceeding 5 per cent. It is noticeable in this instance that the omission of the words “not exceeding” would in no way affect the phraseology or grammatical construction of the sentence in which they are used. No reconstruction would be required to make perfect sense, and without them there would be a plain specific declaration that the proposed addition to the compensation should be 5 per cent. If that was the intention, -why the injection of words wholly unnecessary to the expression of the intention and calculated to raise a doubt as to it? Under every rule of construction we are to presume that the words used were used for a purpose and are required, unless in irreconcilable conflict with other words, to give them their proper meaning. In construing a statute full effect, if possible, must be given to every word, clause, and sentence, and none are to be regarded as superfluous or insignificant. If these words are not intended in this instance to relate to the amount of increase and to carry the usual implication that the stated per cent of that increase is not a fixed percentage necessarily to be applied in all cases, but is the maximum authorized increase, then some other application for the words must be found. No word in a statute is to be treated as an “ intruder ” and eliminated from the statute if its use is consistent with other words used in connection with it. United States v. Verde Copper Co., 196 U. S., 207-213.
The words in question are found in an appropriation act and in a clause thereof appropriating money for inland transportation of mails. They must apply in some form or Other to payment to be made, and if they do not apply specifically to the percentage rate of increase to be paid each railroad under each of its contracts for carrying the mails, they must apply either to an increase in gross of the compensation for transportation or in some peculiar way to the amount of the appropriation. There is no other element in the legislation of such a nature as to permit any possible application of the words in question. It seems sufficient as to the first proposition to say that the application of these words to gross compensation of all railroads rather than to increased payment to each can not serve to change the con- *365 elusion to be reached as to their meaning. An increase in gross payment of “ not exceeding 5 per cent ” is no more to be interpreted as an absolutely directed 5 per cent increase than is a provision for an individual increase of “not exceeding 5 per cent” to be so interpreted. No reason applies to one which does not apply to the other. There can be no application of the phraseology in question to the amount of the appropriation unless it can be determined that, having ascertained the amount necessary to be appropriated for inland transportation of mails, Congress, in connection with the provision for additional compensation on account of parcel post, increased the appropriation by 5 per cent. This fact is only inferentially shown, but conceding it to be true, as it probably is, it can have no significance. Tf Congress intended to authorize a discretionary increase with a maximum limit of 5 per cent it could not know that the full authorized increase would not be paid in all cases and it was necessary to make that full amount available by appropriation. Such is the practice in all such cases and the only reasonable method of procedure, and if it could be demonstrated that Congress in fact increased the amount of the appropriation by the exact amount necessary to pay a flat 5 per cent increase, that fact, in the face of any language implying a discretion, could only mean that Congress made it possible for the official in whom the discretion was vested to exercise it to the limit if he saw fit. He could not do it •unless the appropriation were so made.
But all this can, in my opinion, aid but little, if any, in reaching a correct conclusion as to the meaning of the act. There is no more authority for transposing words or sentences unnecessarily than there is for disregarding them. They are found in connection with the percentage of increase ; they were intelligently used in that connection, and in that connection they must be interpreted. Further, they must mean something. All words mean something, and none may be arbitrarily disregarded. Their meaning is to be determined from the connection in which they are used, and their relation to other words associated with them. The proper province of some words is to modify other *366 words and as used in this act the modifying force of the words “ not exceeding ” is directed to the words .“ 5 per cent,” and they must serve to remove or modify the absolute character of the latter words unless some good reason can be found for disregarding them.
With reference to the defendant’s contention that there is a discretion vested in the Postmaster General within the maximum stated, it is said that this argument is predicated on the word “ authorized ” as used in the act when followed by the words “not exceeding 5 per centum thereof per an-num,” and the meaning to be given the word “ authorized ” is discussed in the light of the authorities. If this statement correctly indicates the basis of the defendant’s contention, then, *in my opinion, the fault is in the argument used and not in the result. Conceding, as I have already done, the question so far as the interpretation of the word “ authorized ” is concerned, and as to the argument of the Chief Justice in that respect, I take no exceptions but am in accord, we revert to the proposition I have already stated that even though there be a nondiscretionary duty to act there remains a discretion as to the action to be taken, found, not in the word “ authorized,” but, by necessary implication and usual rules of interpretation, in the words “not exceeding” and in the otherwise entire absence of necessity or reason for their use. For, in addition to the observation that without them the act would require a straight 5 per cent increase, they would be wholly unnecessary for the purpose only of limiting a directed 5 per cent increase to that amount, for under every rule of interpretation of appropriation statutes a specific direction to increase 5 per cent would be held to limit to that amount the authority to increase.
In our process of interpretation we come now to consider the proposition but for which the argument in favor of a flat increase of 5 per cent must be without any substantial foundation. It is found in the argument that the act required that the percentage of increase should be equal, that the plan adopted was inequitable and the invoking of the principle that “equity delighteth in equality.” I find no fault with the principle nor with its general application nor with its application to this case. In my judgment it has *367 not been disregarded, and the exercise of a discretion does not necessarily result in its violation. From one standpoint it is to be conceded that the principle has seemingly been disregarded, but I am inclined to think there is another and a different view of the transaction resulting necessarily in a different conclusion.
There are apparently two possible views with reference to the effect of this particular contention, and perhaps they should be considered. Assume the proposition to be that the procedure on the part of the Postmaster General under this act was inequitable, a violation of the principle stated. Does the inequity of the plan adopted go to the question of the construction of the act and furnish basis for the conclusion that Congress, presumably intending no such inequity, must have intended a flat and equal increase of 5 per cent without discretion in the matter, or does it support and justify the conclusion that, conceding a discretion in the Postmaster General, there was such an inequitable use of the discretion to the detriment of the intended beneficiaries as to give them a remedy in the courts notwithstanding the imposed discretion?
In either event there would be no occasion to question the jurisdiction of this court, and what is said on that subject is concurred in. If, under a discretion, the Postmaster General’s action was “ arbitrary and capricious,” terms used by the Supreme Court, to the detriment of a beneficiary, or not in good faith, such an abuse of discretion could conclude no one and the courts would furnish a remedy. But, as I understand what has been said, it is not concluded that there was a discretion which it is shown was improperly exercised, but that there was no discretion granted, and the inequity of the plan is suggested in furtherance of the argument to that end.
It would seem apparent that if the inequity of the plan adopted is to become a legitimate basis, either in whole or in part, for the conclusion that there was no discretion vested, it must necessarily be accompanied by the conclusion that that plan was the only plan available under a discretionary authority. Otherwise it can not serve to exclude the idea of a discretion, but indicates an improper use of the *368 discretion. The difference is material, since it goes to the question of whether there was or was not a discretion, and, if standing alone, it tends only to support the theory of an abuse of discretion, it is of no value in support of the conclusion that there was no discretion.
But I am not prepared to concede that there was any such inequity as would support either contention. On the contrary, judged in connection with the whole system of railway mail pay, which we are certainly not now to regard as unauthorized, I am inclined to the opinion that it developed more of equity than any other possible plan, at least more of equity than a straight 5 per cent increase.
Preliminarily, attention has been called to the fact that a Senate amendment to the post office bill directed the Postmaster General to weigh the mails for not less than 30 successive working days and to readjust compensation from the commencement of said weighing at not exceeding the rate provided by law, and that the House refused to concur in this amendment, as a result of which the provision as now under consideration was written. This matter of legislative history is for consideration for what it is worth. But how does it sustain a contention against the theory of a granted discretion? The record doesn’t tell us why one provision was rejected and the other adopted. If we are to theorize we might conclude that the expense of the weighing for 30 days was influential, but with more reason we may conclude that .the potent consideration was the fact that the proposed plan, in the midst of contract periods, would necessarily result in giving the railroads having contracts the benefit, for the remainder of those periods, of the normal increase in mails other than parcel post, a benefit which otherwise and under the regular system would not accrue to them until, in the separate sections, they became entitled to the regular quadrennial weighing. If this was, perchance, the controlling motive, the Postmaster General, under his plan, did not operate counter to the legislative intent. While his plan did involve, in a sense, a readjustment of compensation under the usual schedule of relative compensation and weights, it did not involve or take any account of increased weights of mails other than parcel post.
*369 Under the system long in use for determining the contract compensation for carrying the mails, it was not in all cases in the same proportion to the weight carried. For a larger average amount of mail per day the contract called for a lesser rate per pound. Under statute, the maximum authorized allowance for 200 pounds was $50; for 500 pounds, $75; for 1,000 pounds, $100, etc. The first 200 pounds authorized a payment of $50, an increase of 300 pounds as between the first and second classification brought an authorized increase in compensation of $25, while as between the second and third classifications it required 500 pounds of increase in weight to authorize the same increase in compensation. That there might be some fair apportionment of the compensation between the amounts fixed as the maximum for the weights stated, a schedule was devised further graduating the compensation. It was of course impracticable to compute compensation on the basis of actual average, to the pound, of mail carried and therefore, on the basis of the statutory máx-imums stated, subject to later enactments as to readjustments of compensation, increased weight from 200 to 500 pounds was divided into 25 units of 12 pounds each as to each of which there was apportioned $1 of the authorized increase of $25 in compensation. For the increased weights between 500 and 1,000 pounds the units were 20 pounds and no allowance was made for any portion of a unit in either case. Thus the nearest approach to absolute equality deemed practicable resulted in paying the same compensation for 260 pounds per day as for 250 and the same for 519 pounds as for 500, while one road hauling 262 pounds per day received $1 per mile per annum more than a road hauling 261 pounds, and a road hauling 520 pounds received $1 per mile more than a road hauling 519 pounds. This has never been regarded as inequitable although a weight in one case of 11 pounds and in the other of 19 pounds per day produced no compensation, while 1 pound more produced an added $1 per mile. The system is, in principle, of common application. In recent cases we have had for consideration, involving transportation of troops, we have had before us a system of rates devised by the railroads themselves under *370 which to avoid infinitesimal splitting of fractional rates for transportation in excess of a given distance and to protect a rate for that distance the railroad companies received the same compensation for carrying a soldier 343 miles that they received for carrying him 300 miles, although they received an increased compensation for carrying him 344 miles. The situation outlined, for present purposes, shows only that the established system has never been free from possible inequalities, although never regarded as therefore fatally inequitable.
The purpose of the legislation under consideration was to provide additional compensation to the railroads for carrying increased weight of mail on account of the parcel post. It appears from the record in the case that the approximate increases on the routes in question over the plaintiff’s lines varied from 4 to 39 per cent, an increase in one case of nearly ten times that in another. For the purpose of determining the equities of the proposition resort to the extremes is certainly proper; but suppose we take it on a comparative mean basis, a certainly conservative method of test not required. It happens peculiarly that of the 104 routes here involved upon which the percentage of increase was estimated, the increase in just half is under 10 per cent. The average increase on these 52 routes was 7.18 per cent. On the other 52 routes on which the increase was 10 per cent or more the average increase was 14.54 per cent, so that the average increase on the 52 of highest per cent of increase was double the average on the other 52. But, aside from these figures, we must know — indeed, it appears from the act itself — that the parcel post was yet young, and if there were cases on the plaintiff’s lines showing an increase of only 4 or 5 per cent it is not unreasonable to assume the possibility that there might have been even less increase in some parts of the country, and so small, if any, in some instance as to be wholly negligible. In the face of these conditions, presumptively known at least in a general way to those called upon to legislate with reference thereto, is it to be presumed that Congress intended an equal percentage of increase to all without regard to the increased service rendered and, indeed, without regard to whether any increased service at *371 all had been rendered? And is it inequity because, in such circumstances, the Postmaster General did not bestow compensation equally to all without regard to service rendered ?
The Postmaster General took the ascertained percentage of increase in the amount of mail carried on the basis of the last weighing and, adding it to the original amount, he applied the established rule as to the compensation for the resultant amount of mail. If, perchance, in a case cited it resulted in no increase, it was because the increase was so small that the amount remained within one of the units above referred to, or because the compensation was already up to the maximum allowable for the total weight. If in two cases the same percentage of increase in weights resulted in a different increase in compensation, it was because the increased weight added to the differing original weights carried the total weights into different units, or because, possibly, being in different statutory classifications the unit of increase was different. In any event, the only inequality was the same inequality always existing under the established system referred to above and never regarded as a fatal inequity.
But there is yet another feature of the matter which seems to me worthy of consideration. The increases thus to be provided for were only to apply to the divisions having contracts yet to run under former weighings for one, two, and three years. It did not apply to the other division within which a quadriennial weighing was due and within which the parcel-post mail, at that weighing, would be absorbed with the other mail, and compensation for all fixed on the usual basis. Is equity to be determined in the one case, as between the roads in the three divisions, by a hard and fast rule of equal percentage of increase without relation to service, and by another rule as between those three divisions and the fourth division on which a reweighing was to occur? Why did Congress except this one division from the operation of this provision? Clearly and only because the reweighing was to occur as a result of which the roads in that division would be paid for parcel post on the usual basis as other mail was paid for, and just as the Postmaster General under his plan paid the roads in the three divisions. *372 Assume in one of the extreme cases where no increase was paid that that route was within the excepted division and that, without increase in the normal mail other than parcel post, there had been the same percentage of increase on account of parcel post — the result as to its compensation would have been the same. And if, perchance, there was carried over another route in one of the three divisions the same amount of mail, according to its last weighing, with the same increase in parcel post, instead of both faring alike, as they would under the Postmaster General’s plan, one would receive no increase and the other would receive the prescribed 5 per cent. As between all the roads in all the divisions, it seems to me the plan adopted was the only plan possible to put them all on the same basis, leaving only such inequities as have always existed under the present system and under the same circumstances.
It is argued that Congress rejected a reweighing plan and probably because it would result in a readjustment of compensations paid not only on account of parcel post, but also on account of the normal increase in other mails, and that the Postmaster General by his plan did, in this respect, just what Congress did not intend should be done. But this view of the matter, I think, is founded on error. There was no procedure on the part of the Postmaster General which served to give any of the carriers the benefit of any normal increase in mails other than parcel post. The percentage of increase on account of parcel post was determined by using the weight of mails carried, as shown by the last weighing, as the basis. It was an estimated percentage of that weight and the adjustment was on the basis of the addition of the percentage of increase to that weight and that weight alone.
Contrary to the views entertained when this matter was first presented, I am convinced, after careful study of the matter, that the plan adopted by the Postmaster General was not only an equitable plan, but the only equitable plan. Compensating the carriers for increased mails carried under an authority which limited increases to 5 per cent, the more pronounced inequities must fall on those carriers which might have been entitled to more than the stipulated per *373 centage under the plan adopted, but for the limitation, and such inequities spring from the limitations of the law itself. Those to whom lesser payments were made were compensated, under the established plan and based on the service rendered, in the same proportion as those receiving the full authorized increase. The apparent inequities were for the reason already stated.
It seems to me that the argument in support of a flat 5 per cent increase construction, without discretion, which is predicated on the alleged inequities of the plan adopted,, must fail for any purpose.
For the reasons stated I am of the opinion that the act in question vested in the Postmaster General a discretion as to the increases to be paid which he might very properly regulate upon any reasonable basis in proportion to service rendered and that he acted in the exercise of such discretion and in so doing did not act arbitrarily or capriciously or in bad faith. The exercise of a judgment or discretion, when not arbitrary or capricious, or in bad faith, is not subject to revision.