Downet, Judge,
delivered the opinion of the court:
The. plaintiff’s suit is upon a contract dated October 29, 1917, for the construction of howitzer carriages, with which we are not now concerned except as to identity for the purpose of distinguishing it. The questions for consideration arise on demurrer to the defendant’s counterclaim predicated on alleged facts growing out of the performance by the *727 plaintiff of an order of November 16, 1917, for howitzer carriages, which order was entirely separate and distinct from the contract sued on by plaintiff.
The counterclaim is lengthy and, aside from a brief summary, its allegations in so far as they present questions for consideration may best be referred to in the course of the discussion. It is an amended counterclaim, but it is not necessary to repeat the adjective in referring to it, since it is now the counterclaim.
It alleges, in substance, the placing with plaintiff of an order in writing for 964 9.5-inch howitzer carriages on a cost-plus basis, defined somewhat in detail; a noncompliance with section 3744, B. S.; entry upon performance; a cancellation order afterwards modified so as to exclude therefrom 200 carriages which were completed and delivered; the filing of a claim, under the Dent Act, with the Ordnance District Claims Board at Chicago; the prescribed organization, functions, and procedure before the various claims boards; findings or award in favor of plaintiff by the District Claims Board, made an exhibit to the counterclaim, in the sum of $2,200,000, made up of 12 items, from which it was found that a deduction of $900,000 should be made on account of property conveyed to the plaintiff, leaving a net award of $1,300,000; the approval of this award by the Ordnance Department Claims Board and the War Department Claims Board and the making of a “ statutory award ” made an exhibit to the counterclaim, awarding plaintiff $2,200,000 less $900,000, executed by the War Department Claims Board “by authority of the Secretary of War,” but, it is alleged, without any personal investigation or knowledge on the part of the Secretary; the acceptance of the award by the plaintiff and the payment to it of said $1,300,000.
It is then alleged that the finding or award of the Chicago District Ordnance Claims Board contains statements which are false in fact and in law; and, taking up the various items in order, there are detailed allegations with reference thereto preceding the general averment that for the most part these allowances were illegal and void and seeking-recovery against the plaintiff in the sum of $2,012,654. This *728 statement, as to the counterclaim will, of course, be understood to be merely a sumnlary in general terms.
The plaintiff demurs to the counterclaim on the ground that “the amended counterclaim and the matters therein stated and set forth are not sufficient in law for the United States to have or maintain its aforesaid amended counterclaim against the claimant herein, Standard Steel Car Co., and that the claimant is not bound by the law of the land to answer it.”
It would seem that the primaiy question for consideration, with others to follow if found necessary or advisable for consideration, is as to the-right of this court to review an award made by the Secretary of War in a Dent Act case at the instance of the United States under the circumstances alleged in the counterclaim.
It is contended that the action set up in the counterclaim is not one to set aside the award made by the Secretary of War, and while it is entirely true that the relief sought is not so in terms pleaded it is sought to recover the amount, or very nearly the entire amount, two items being excepted, awarded to the plaintiff by the Secretary of War, paid pur-' suant to that award, and accepted by the plaintiff in satisfaction of its claim, and even though it be not prayed that the award be set aside that must undoubtedly be the effect of the rendition of a judgment for the recovery of the amount awarded and paid. A determination of the merits of the counterclaim on the facts must necessarily involve a 11 review ” (a word found in the statute) of the award, and if a judgment for the recovery of the money awarded and paid could be rendered without having the effect of setting aside the award, even though not so decreed in terms, the plaintiff would remain the beneficiary of an award duly accepted and paid but converted into an anomalous sort of a rmdum jjaetum by the requirement that it surrender the fruits. We can not escape the effect of an action by contention as to the name with which we will christen it.
It is not inappropriate, before proceeding further with the discussion, to suggest the importance, as we see it, of bearing in mind that the counterclaim before us for consideration bears no relation whatever to the cause of action *729 sued on by the plaintiff herein. The transactions which are the basis of the plaintiff’s complaint and the defendant’s counterclaim were necessarily between the same parties, but otherwise they are entirely separate and distinct; one seeks the adjustment of unsettled claims, while the other is predicated upon transactions not only entirely distinct but as to which there was a final settlement and payment. Under these circumstances it is not a case in which the counterclaim might be regarded as before the court without pleading, as has frequently been the case where open accounts were involved or where they were both the outgrowth of the same transaction and the whole case was deemed before the court for adjustment, but the counterclaim is in the nature of an independent counter action of which this court would not have independent jurisdiction, except when pleaded as a counterclaim, and hence one in which it must be subjected to the same tests as if it were an original petition in an independent action in a court of competent jurisdiction.
It is to be taken as uncontroverted that the claim upon which the Secretary of War made his award as alleged in the counterclaim was one of which he had jurisdiction under section 1 of the Dent Act (act of March 2, 1919, 40 Stat. 1272), and much of that lengthy section may be omitted from the quotation. The Secretary of War was authorized to adjust, pay, or discharge upon á fair and equitable basis agreements of the character described.
“ Provided-, That in no case shall any award either by the Secretary of War or the Court of Claims include prospective or possible profits on any part of the contract beyond the goods and supplies delivered to and accepted by the United States and a reasonable remuneration for expenditures and obligations' or liabilities necessarily incurred in performing or preparing to perform said contract or order: Provided further, That this act shall not authorize payment to be made of any claim not presented before June thirtieth, nineteen hundred and Uineteen: And provided further, That the Secretary'of War shall report to Congress at the beginning of its next session following June thirtieth, nineteen hundred and nineteen, a detailed statement showing the nature, terms, and conditions of every such agreement and the payment or adjustment thereof: And provided further, That no settlement of any claim arising under any such agreement *730 shall bar the United States Government through any of its duly authorized agencies, or any committee of Congress hereafter duly appointed, from the right of review of such settlement, nor the right of recovery of any money paid by the Government to any party under any settlement entered into, or payment made under the provisions of this act, if the Government has been defrauded, and the right of recovery in all such cases shall exist against the executors, administrators, heirs, successors, and assigns of any party or parties: And provided further, That nothing in this act shall be construed to relieve anjr officer or agent of the United States from criminal prosecution under the provisions of any statute of the United States for any fraud or ■criminal conduct: And provided further, That this act shall in no way relieve or excuse any officer or his agent from such •criminal prosecution because of any irregularity or illegality in the manner of the execution of such agreement: And provided further, That in all proceedings hereunder witnessses may be compelled to attend, appear, and testify, and produce books, papers, and letters, or other documents; and the claim that any such testimony or evidence may tend to criminate the person giving the same shall not excuse such witness from testifying, but such evidence or testimony shall not be used against such person in the trial of any criminal proceeding.”
It is not necessary to review conditions during the war which necessitated the placing of many informal orders for war supplies and the patriotic response of manufacturers without waiting for the protection of formal contracts, leaving them, upon the rather sudden and unanticipated coming •of the armistice, without the right to enforce their just demands against the Government and the means to reestablish themselves in commercial pursuits, a condition which Congress met by the passage of the Dent Act, concluding, no doubt, not only that the Secretary of War was best equipped for this great task, because a large part of the transactions were with his department, but also that settlements would thus be facilitated and money due be the sooner made available in the interest of the business of the country.
The jurisdiction conferred on the Secretary of War was very broad, but at the same time there were limitations provided. Broad discretion is necessarily implied by the pro *731 vision authorizing him to adjust, pay, or discharge “ upon a fair and equitable basis,” but it is provided that “ in no ca,se shall, any award include prospective or possible profits on any part of the contract beyond the goods and supplies delivered to and accepted by the United States and a reasonable remuneration for expenditures and obligations or liabilities necessarily incurred in performing or preparing to perform said contract or order,” language which indicates that it was within the contemplation of Congress that profits would be allowed on goods and supplies delivered and accepted and that for expenditures, obligations, or liabilities necessarily incurred there would be remuneration defined as “ reasonable,” another word implying the necessary exercise of a discretion.
The legislative history of the act, amendments offered and rejected, etc., are called to our attention as an aid to construction, and established rules with reference thereto are cited, but we get little if any help from that source. It is, after all, a conclusion to be drawn from what happened or was proposed and, as it eventuated, we find nothing better to do than to take the act itself as the final expression of Congress and from it and its atmosphere determine the intention. Argument, in one feature, is predicated on the fact recited that at one stage of the legislation it carried, by Senate amendment, the language “ and a remuneration, which may include a reasonable profit, for expenditures and obligations or liabilities necessarily incurred,” and that the words “ which may include a reasonable profit ” were stricken out. This, it is said, happened fin conference, and that no minutes of the debates in conference are available by reason of which we are uninformed as to what were the actual views of. the conferees on the question, but it is argued that this action was a clear indication of the intention of Congress that no profits of any . kind should be allowed on expenditures, obligations,.or liabilities. While this conclusion may be justified, it would seem that when the whole story is told, the action will appear in a different light.' Well might it have been concluded that the use of the word “ profits ” in application to some classes of expenditures , and particularly to obligations and liabilities was inapt, but *732 whether the provision for the inclusion of a reasonable profit was stricken out for that reason or for some other, of which we are not informed, it must be noted 'that when the act appeared with these words stricken out there appeal’s before the word “ remuneration ” the very significant word “ reasonable,” This eliminates any conception that the word “ remuneration ” was used as meaning reimbursement only, and strengthens the view that, for the most part at least, it was the purpose to avoid fixed rules and rely upon a discretion which might meet each separate condition as its settlement “ upon a fair and equitable basis ” might demand.
In solving its problem of providing for the speedy adjustment of claims of this sort, Congress did not create a board or commission or endow with authority an individual not officially connected writh the Government, but it selected the Secretary of War, one of the high officials of the United States, to make settlements of claims in all of which the United States was an interested party.
In the second section of the act it gave to this court jurisdiction to find and award “ fair and just compensation ” on the petition of a claimant who was unwilling to accept the “ adjustment, payment, or compensation ” offered by the Secretary of War; in other words, a right in the claimant of ajipeal to this court, but significantly, except in a paragraph to be hereafter referred to, there is no granting* of any such recourse to the United States and no suggestion or intimation of anything as to lack of finality in the Secretary’s award, so far as the United States is concerned. It was apparently conceived that it would scarcely be fair to claimants to require them to submit to a determination of their rights by the adverse party without a right of appeal, but a careful study of the whole act, the reasons for its enactment, and the purpose to be accomplished must lead to the conclusion that the United States, having entrusted adjustment to its own representative, to whom claimants must submit their claims if they .secured any relief at all, intended, and rightfully so, that it would abide the result, except under the circumstances stated in one proviso of the act which but serves to emphasize this conclusion as to all instances not falling within that proviso.
*733 After providing for a report to Congress at its next session following June 30, 1919, it is provided further:
“ That no settlement of any claim arising under any su'ch agreement shall bar the United States Government through any of its duly authoriz’d agencies, or any committee of Congress hereafter duly appointed, from the right of review of such settlement, nor the right of recovery of any money paid by the Government to any party under any settlement entered.into, or payment made under the provisions of this act, if the Government has been defrauded, and the right of recovery in all such cases shall exist against the executors, administrators, heirs, successors, and assigns, of any party or parties.”
Some portions,, of this language may be somewhat obscure, as, for instance, the phrase “ through any of its duly authorized agencies,” but in so far as we are now concerned it is plainly language intended to define the condition, and, it seems to us, the one condition, under -which a settlement by the Secretary of War may be reviewed and money paid recovered. No settlement, it is said, shall bar review thereof or recovery of money paid if the Government has been defrauded.
This language read as a part of the whole .section evidently implies but one thing and that is that it defines the only condition under which a settlement by the Secretary of War can be reviewed or money paid recovered. It seems scarcely necessary to refer, as a legal proposition, to the well-lcnoAvn maxim, Incl/usio unius est exchisio alterius, where the import of the language used is so patent. Back of its import it forces the conclusion that Congress was giving consideration to the question of the finality of the ■Secretary’s awards as against the United States and that it spoke with full comprehension of the situation when it provided one condition under which settlements made .should not bar review. And the form of the declaration on this subject is of peculiar force. If it had been provided in affirmative form that settlements might be reviewed and money recovered if the Government had been defrauded, resort to the rule of construction announced in the quoted maxim might be necessary, but we need not resort to anything more than a common-sense interpretation of plain *734 language when the provision takes the form it does,-and the language itself, in the connection in which used, certainly means that no settlement may be reviewed or payment recovered by the United States unless the Government has been defrauded.
This seems to us in no sense a far-fetched or extreme construction of the act. On the contrary it is the construction necessary to effectuate its purposes. The act, in its purpose, was not directly for the benefit of the United States, but in aid of contractors who had been engaged in supplying war needs. It was primarily to do them justice where-they were otherwise without a remedy; it ay as secondarily, but of scarcely less importance, to do it speedily, with two motives, the one that contractors engaged in war Avork might on their OAvn account be enabled to reestablish themselves in peacetime Avork, the other that by so doing they might also aid in stimulating the business interests of the country during the reconstruction period following the war, and furnish employment to men dependent on their labor for a livelihood. And it is quite apparent that it was necessary to the accomplishment of these purposes that there should be finality to the settlements made.
As to rules of statutory construction here applicable, Ave find no occasion to take issue with defendant that “ Effect must be given to all provisions of a statute ” and that “ The intent of the laAvmaker is the law,” and see no occasion to reAÚeAY the authorities cited. We can not, hoAvever, but refer Avith approval to the quotation from the opinion of Judge Nott. of this court, wherein, in Upton v. United States, 19 C. Cls. 46, 49, he says that judges, to interpret aright, “ must put themselves in the position of the legislators Avho made the statute and gather from the general purpose the meaning of the obscure parts,” and we find particularly apt the (]notation from- Chief Justice Marshall, who, in Durousseau v. United States, 6 Cranch 307, 314, said: “The spirit as Avell as the letter of a statute must be respected, and where the whole context of the law demonstrates a particular intent in the legislature to effect a certain object, some degree of implication may be called in to aid that intent.” The sug- *735 ideations above are in line with these authorities, and we may-find occasion to refer to them again.
There follows for determination, in this connection, the meaning of the word “ defrauded,1’ and the views just expressed naturally suggest the question whether, as used, it does not necessarily mean something more than the good faith payment by the Secretary, without inducement through xmfair practices on the part of the claimant of something which, in the judgment of another branch of the Government, fortified possibly by sufficient considerations upon which to predicate its judgment, the Secretary should not have paid. Whether, returning to the language of the act, the United States has been “ defrauded ” in the sense in which the word is used, if, in the settlement of a claim, the Secretary, acting in good faith, without fraudulent inducement, has in fact allowed and paid a sum Avhich includes prospective or possible profits beyond the goods and supplies delivered and accepted and a reasonable remuneration for expenditures and obligations or liabilities incurred, when he has also, in his award, declared that there is no such inclusion. And in this connection it is important to bear in mind that the counterclaim does not charge fraud.
The contention of the Government’s original brief is that although there is no averment of fraud, “the facts set out in the counterclaim constitute in law a fraud against the Government and present to the court a case where ‘ the Government has been defrauded.’ ”
In a supplemental brief filed by defendant some six months later, in which it is stated, rather peculiarly, that while the defense of this action devolves on the Court of Claims Division of the Department of Justice, the prosecution of the counterclaim devolves on the War Transactions Section, there is, if we understand it correctly, no assertion of the theory in the original brief stated above, but rather a reliance on the theory that, irrespective of, the provisions of the Dent Act as to the basis upon which there may be a review or a recovery, and “ fraud or no fraud,” payments which are in fact beyond the’authority of the Secretary'of War, as defined in the act, are illegal payments and may be recovered.
*736 Thus we are confronted with somewhat divergent theories, the one indicating a recognition of the necessity of keeping within the confines of the Dent Act by asserting that the facts pleaded make a case in which “the Government has been defrauded,” the other asserting the immateriality of any “ defrauding,” and, while resorting to the Dent Act for a defining of the authority of the Secretary, invoking an extraneous theory as the basis of a recovery. Inconsistencies may not be fatal if there remains among them one tenable theory, but they certainly affect the strength of the argument. Practical repudiation in one brief of a theory contended for in the other indicates a conflict of views which can not escape observation.
The first theory requires such a construction of the word “defrauded” as will bring this case, under the averments of the counterclaim, within that definition. And it is appropriate to observe that we have not to do with any fraudulent or otherwise improper conduct on the part of the plaintiff as matter of inducement to the settlement, for there is no averment that in the prosecution of its claims the plaintiff was guilty of anything savoring of the perpetration of fraud or deception on the Secretary. It was through the action of the Secretary himself, if at all, in the making of the award he did that the Government was defrauded.
It is well said in the defendant’s original brief that “in most definitions of the word there is found such language as ‘to cheat,’ ‘to deceive,’ ‘to deprive dishonestly,’ and the like, all of which language, practically speaking, includes wrongful or fraudulent intent, which, of course, imports criminality,” but, not contending that this case is within any such definitions, it is said that other definitions contain language which show that one may defraud by acts free from wrongful intent or purpose, and authorities are cited, the first of which, followed by others of similar import is a quotation from Burdick v. Post, 12 Barb. 168, “ To defraud is to withhold from another that which is justly due him.”
The application of such a definition, which is perhaps the mildest to be found in the authorities, seems clearly foreign to this case. The language of the act in the connection used must necessarily imply that the Government was defrauded *737 in connection with or a part of or an inducement to the settlement made. There could then be no withholding of anything due the Government for the Government was confessedly the debtor. If illegal payments were made to the plaintiff and upon ascertainment of that fact demand was made for repayment, which was refused and the plaintiff thereby became guilty, within the definition quoted, of defrauding, that fraud would necessarily be subsequent to the settlement and subsequent to a demand for repayment and hence not the fraud contemplated by the act, and, if that were not true, such a theory is not sustained by any averment in the counterclaim.
Much stress is laid upon the Hume ease, 21 C. Cls. 328, 132 U. S. 406, and it is said to be peculiarly in point. Certainly all that is said by the Supreme Court in that case can not but meet with heartiest approval even from the standpoint of common honesty, aside from its legal phases, but we are at a loss as to the basis for the application of the pronouncements in that case. Included in a bid, eventuating into a contract, for supplies to be furnished the Government Hospital for the Insane was an item of shucks at 60 cents per pound, when they were worth'6 mills to 1% cents. The Government refused to pay the price, suit was brought in this court, where it was held that such a contract was not enforceable because unconscionable, and, there being no finding of fraud, it was suggested that 60 cents in the bid was probably intended to be the price per hundred pounds instead of per pound. In passing on the case on appeal the Supreme Court said that persons dealing with the Government must be held to a recognition of the fact that “ Government agents are bound to fairness and good faith as between themselves and their principal,” and that if the claimant intended to induce the Government’s agent to pay a price many times higher than the market value and the Government’s agent knowingly entered into such a contract, such conduct would be fraudulent, and further it is said:
“ If the claimant knew that a clerical error had been committed, of which the agent of the Government were ignorant, and deliberately intended to take advantage of the error *738 to obtain the execution of a contract for the payment of so grossly unconscionable a price, or if the facts were such that he must be held to have known that their action, if understandingly taken, would be in palpable dereliction of their duty to their principal, and notwithstanding sought to profit by it, the character of the fraud, so far as the claimant is concerned, is not changed by the fact that such action was the result of the negligence or mistake of the Government’s agents, untainted by moral turpitude on their part.”
The reliance of counsel is mainly upon the latter portion of the above quotation, if we may so assume from the fact that, beginning' with the words or if the facts,” the rest of the quotation is italicized.
It seems too clear for argument that the holdings in the Hume case find no basis for application here, and as to the latter portion it seems sufficient to say that even if analogy could be found in the facts, which is not apparent, the holding serves to charge the claimant, under the facts stated, with a fraud, for its says “ the character of the fraud, so far as the claimant is concerned,” and, as already said, there is in this instance no charge of fraudulent conduct on the part of the plaintiff. The attempted application of the Hume case seems to be predicated on a misconception of the holding. There was no attempt to determine the case on the question of the authority of the contracting officer, but the plaintiff was denied relief by way of a recovery on his contract on the ground of fraud, an actual fraud which, under one supposititious circumstance, was perpetrated by the claimant, the party seeking enforcement of the contract. He, of course, coxdd not be permitted to profit by his own wrongdoing.
How dissimilar, in a marked degree, is the situation here! This plaintiff presented and prosecuted its claim under the Dent Act without resort, so far as is alleged, to any improper practices in an attempt to induce any allowance other than to which it believed it was entitled. The Secretary of War in making his award acted, so far as appears, in perfect good faith. If it should be admitted, as alleged, that he made improper allowances, it is not averred that they were corruptly made, or even wrongfully made with knowledge that they were wrongful, or were aught else than a mistake *739 in the exercise of an honest judgment, nor is it alleged that the plaintiff received any allowance with knowledge that it was wrongful or unauthorized. Whether the Secretary allowed all that plaintiff claimed does not appear. The probabilities are that he did not; but however that may be, he made an aAvard which plaintiff was willing to accept and which it was required to and did accept in writing before payment.
Had the Secretary refused to allow plaintiff’s claim, or a. sum thereon which plaintiff w'as willing to accept, plaintiff' would have had its appeal to this court, where it might, have contended for the allowance of its full claim, whatever that may have been. But having accepted in good faith the Secretary’s award, with every reason to rely upon its finality, it is, after the lapse of nearly five years, called upon by another agency of the Government to refund because of the alleged illegal but good faith action of the agency with which it dealt, also in good faith, or to defend the action of the Secretary at a time when perchance it may be at a disadvantage by reason of the lapse of time, and when, if perchance its claim was for more than was allowed by the Secretary, it has been, by its acceptance of his award, presuming upon its finality, deprived forever of its right to prosecute its claim for the excess.
While, as said in the Hume case, it is the law that those dealing with the Government must be held to a recognition of the fact that Government agents are bound to fairness and good faith as between themselves and their principal,, necessary elements of official conduct, the existence of which, it may be said is not negatived in this case, it is also the law that a presumption is to be indulged that public officials are-honest and faithful and act within their lawful authority in the discharge of their official duties.
It is not intended to suggest that such considerations as those mentioned may of themselves conclude the Government; but when considered in connection with the well-established rale that it is the policy of the law to sustain and enforce settlements made, in the absence of fraud, and not to foster litigation, it is pertinent to observe that under such circumstances collateral attack upon such a settlement *740 should not be permitted except upon a very clear showing of substantial and tenable basis therefor. And if such an attack is permissible only on the ground that the Government has been defrauded, there must be such substantial averments as will bring the case clearly within the meaning of the word “ defrauded ” as used in the act.
The averments relied upon as constituting a defrauding of the Government are in substance, briefly stated, that the Secretary made illegal payments in that he allowed prospective profits prohibited by the act and more than a reasonable remuneration for expenditures and obligations or liabilities necessarily incurred in performing or preparing to perform the contract; and since these are substantially the grounds upon which under the other theory it is contended recovery may be had as of illegal payments, “ fraud or no fraud,” some matters for consideration may be applicable to both theories, although the second must in some respects be for separate consideration.
Whether the demurrer admits the truth of the general averments of the counterclaim may in this case well be doubted, and to the extent that those averments are but conclusions of the pleader there is no room even for doubt. The award of the Secretary of War, with other documents, is made a part of the pleading, and general averments of the pleader may not prevail as against the declarations of the instrument itself. When the pleader sees fit to aver generally that statements contained in the award, a part of the pleading, are false, or otherwise to aver generally in conflict with the provisions of the instrument, such general aver-ments under such circumstances are not such as must be taken as admitted to be true on.demurrer. The specific aver-ments of facts and their effect will be for consideration hereafter.
As bearing upon both of the theories above referred to, the general scope and meaning of the act in question is for consideration, and particularly is it pertinent to consider the authority or power vested in the' Secretary of War.
It is conceded that the matter with which the Secretary of War dealt in the making of this award was one of which hé had jurisdiction under section 1 of the act. The extent *741 of his jurisdiction under the act is involved in a statement in defendant’s supplemental brief as to the basis of the counterclaim wherein it is said, “We can not emphasize too strongly thqt the counterclaim is directed at the power and authority which the Secretary of War assumed to exercise, and that it is not directed toward any discretion or judgment which the Secretary of War may have enjoyed under the provisions of the act.” This statement, supplemented by subsequent language not necessary to quote, concedes a discretion in the Secretary of War, but denies to him powers which it is said he “ assumed to exercise ” and necessarily raises a question as to the extent of his jurisdiction.
Jurisdiction is power to consider and decide. In Erickson v. United States, 264 U. S. 246 at 249, it is said: “ Jurisdiction is power to decide the case either way, as the merits may require.” In Ex parte Moran, 144 Fed. 594, Mr. Justice Sanborn said: “Jurisdiction of a question is the lawful power to enter upon the consideration of and to decide it. It is not limited to making correct decisions. It necessarily includes the power to decide an issue wrong as well as right.” Recognition of the distinction is found in the words of the Chief Justice when in his concurring opinion in Craig v. Hecht, 263 U. S. 255 at 279, he said: “This raised the sole issue whether the trial' judge had authority to decide the question, not whether he had rightly decided it.” And in Fauntleroy v. Lum, 210 U. S. 230-234, Mr. Justice Holmes said: “No doubt it sometimes may be difficult to decide whether certain words are directed to jurisdiction or to merits, but the distinction between the two is plain. One goes to the power, the other only to the duty of the court. * * * Whether a given statute is intended simply to establish a rule of substantive law and thus to define the duty of the court or is meant to limit the power is a question of construction and common sense. When it affects a court of general jurisdiction and deals with the matter upon which that court must pass we naturally are slow to read ambiguous words, as meaning to leave the judgment open to dispute or as intended to do more than to fix the rule by which the court should decide.” And in this connection it is well to observe *742 that the limiting proviso relied upon as the basis for recovery applies in exactly the same terms to awards by the Secretary of War and by the Court of Claims.
Both parties to this contention agree that in interpreting this act we must consider all of its provisions, and that among other things we must consider the purposes intended to be accomplished. It was intended to provide a method •of adjusting, on a fair and equitable basis, and paying or ■discharging all agreements of the kind specified. There is mo limitation on the discretionary power to adjust on a fair and equitable basis until we reach the proviso in question, applying both to awards by the Secretary and this court, excluding from allowance prospective profits beyond a certain limitation and more than a reasonable remuneration for expenditures and obligations or liabilities. If, therefore, the act is to be effective for the accomplishment of its purposes in the making of settlements, not only on a fair and equitable basis, but excluding prospective profits beyond those stated and more than a reasonable remuneration in the other named respects, it is necessary, that the Secretary be clothed with power to examine the whole claim and determine whether or not it contains any of the prohibited elements.
It would perhaps be taken as a matter of common knowledge (if not, there is sufficient in this counterclaim to demonstrate it) that agreements for adjustment under this act involved enormous war-time transactions and adjustments necessarily involved elaborate 'and complicated details. The order involved in the settlement in question was for 964 9.5-howitzer carriages, and the cancellation of such an order during partial performance could not but result in a multitude of details necessarily involved in a settlement. If, in the making of a settlement which is to be fair and equitable, but as to which it is directed that prospective or possible profits on any part of the contract beyond the goods and supplies delivered and accepted shall not be included, it seems self-evident that power or jurisdiction is implied, more, must necessarily exist, to consider the claims and determine whether or not such prohibited profits are included, following winch it becomes the duty of the Secretary to *743 exclude them if found to exist, and, within the principles stated above, the jurisdiction to decide is not affected by the correctness or otherwise of the decision, requiring the conclusion that the proviso in question does not go to the jurisdiction to decide, which implies the exercise of judgment, but furnishes a rule of law applicable after the decision is made.
This view seems to be entirely consistent with other provisions of the act, for if there is power to decide the decision is only subject to collateral attack for fraud, and the provisions of the act with reference to a review or a recovery of money paid are limited to cases in which the Government has been defrauded.
Upon the question as to whether such a determination is subject to collateral attack except for fraud, counsel are of different views and cite many authorities which it is contended are applicable, the defendant’s contentions including proceedings before strictly judicial tribunals. But an examination of the authorities seems to justify the conclusion that the holdings are for the most part at least predicated upon a lack of jurisdiction and not upon error in the exercise of an existing jurisdiction.
Adams v. Terrell, 4 Fed. 796, is referred to as holding that .“no court can acquire jurisdiction in violation of law and shut out inquiry by asserting or assuming that it possesses it,” a proposition which certainly can not be controverted; but our view is not predicated upon an assumption of juristion by the Secretary of War but upon a granting by the act of a jurisdiction necessary to the accomplishment of its purposes, bearing in mind that we are now considering jurisdiction and not facts.
It is said that when a court transcends its authority it is not acting within its jurisdiction, and there is a lengthly quotation from Windsor v. McVeigh, 93 U. S. 274, 279, in which there are illustrations of limited jurisdiction and of instances said to be beyond the jurisdiction of the court, but they are all illustrations which deal with jurisdiction in its true sense and not with questions as to error in the result of an exercise of jurisdiction. And there is italicised, quoting the statement that “the doctrine stated by counsel is only correct *744 when the court proceeds after acquiring jurisdiction of the case according to the established modes governing the class to which the case belongs,” these words, “ and does not transcend, in the extent or character of its judgment, the law which is applicable to it,” which in the light of the question for decision and' the illustrations used clearly referred not to an erroneous conclusion but to an attempt to include in its decisions some matter not within its jurisdiction to decide. The case specifically recognized as “ undoubtedly correct as a general rule ” the contention that “ when a court has once jurisdiction it has the right to decide every question which arises in the cause, and its judgment, however erroneous, can not be collaterally assailed,” and after citing the exceptions referred to it quotes with approval from Nash v. Williams, 20 Wall. 226, 250, the statement that “the jurisdiction having attached in the case everything done within the power of that jurisdiction (counsel’s italics), when collaterally questioned is held conclusive of the right of the parties, unless impeached for fraud.” The meaning of the italicised words would seem plain even if we read only the quotation appearing in the brief, but when we consult the case and read further it is apparent that they do not justify the application made of them.
The question in the case quoted from was whether a. decree in condemnation, divested the title of a claimant who had not been permitted to appear and interpose his claim and the discussion is largely as to the indispensable character of notice and an opportunity to be heard, and it is following the discussion of this necessary preliminary that the language quoted appears. Following the quotation it is said, “ For jurisdiction is the' right to hear and determine; not to determine without hearing. And where, as in that case, no appearance was allowed, there could be no hearing or opportunity of being heard, and therefore could be no exercise of jurisdiction.” It therefore becomes apparent that the italicised words, “ within the power of that jurisdiction ” and the other words of similar import had reference to an assumed jurisdiction without the necessary prerequisite of notice. It is elemental that jurisdiction without the formality of notice when notice is required can not exist. And in *745 the case of Nash v. Williams, from which quotation is made in Windsor v. McVeigh, in which quotation the last-cited italicised words are found, it is further, among many-pertinent things, said, “ In the absence of fraud no question can be collaterally entertained as to anything lying within the jurisdictional sphere of the original case. Infinite confusion and mischief would ensue if the rule were otherwise.”
It seems hardly necessary to review a number of other cases cited where, in one form or another, the questions were as to the jurisdiction of the courts. The consensus of the holdings of the cases generally is that while there may be a collateral attack upon the judgment of a court for want of jurisdiction, such an attack, where there is jurisdiction, can only be for fraud.
The cases cited have for the most part dealt with courts or tribunals plainly judicial in their character and the question arises as to the application of the same rules to awards made by the Secretary of War under the- Dent Act.
It is contended that the Secretary of War, exercising in these proceedings the powers given him, acts in a judicial or at least a quasi judicial capacity, while on the other hand it is contended that he was simply an executive officer acting in a ministerial capacity. His power to summon and compel the attendance of witnesses, found in the last paragraph of section 1, is cited in support of the first contention, and the necessary delegation of authority as sustaining the other contention. But while the question may be interesting for discussion we do not see that its determination is necessary for present purposes. His powers are to be ascertained from the special act of Congress which gave them to him and it is thought that the act itself and principles applicable, however these powers may be named, will be sufficient for our purposes.
It is said by the defendant that “ It seems clear that under the Dent Act, while the Secretary of War was given discretion to pay, adjust, and discharge claims on a fair and equitable basis, and while it was obviously necessary for him, in order to ascertain what constituted a fair and equitable basis in any given case, to make a determination of certain facts, still his decision or award under the Dent *746 Act can by no means be considered in the nature of a judgment, or indeed anything more than an exercise of the same kind of discretion as is often confided to executive officers by legislative act.”
One feature of this statement would seem to admit some things that we have said in discussing jurisdiction, since it conceded that it is necessary for the Secretary “ to make a determination of certain facts,” but the statement in its entirety is rather preliminary to the contention that the powers exercised by the Secretary are ministerial rather than judicial, and his conclusion by way of award is subject to collateral attack, and the case of Gordon v. United States, 7 Wall. 188, is strongly relied on.
Detailed statement of the case is hardly justified. Gor-dan’s claim, as the legal representative of another, was one of a number of stale claims for property taken or destroyed •by troops of the United States, as to which Congress was importuned for relief. After several attempts at adjustment by the Second Auditor, under authorizing acts and resolutions, all of which were unsatisfactory to the claimant, the Secretary of War was directed to proceed de novo, and the claimant being dissatisfied with the result, the Secretary, by resolution of June 1, 1860, was directed to revise his statement and resettle the account, which he did, making an allowance to the claimant of $66,519.85, but before it was paid Congress rescinded the resolution of June 1, 1860, and declared all proceedings thereunder null and void. Suit was commenced in this court on the “ award ” and demurrer sustained to the petition. In the Supreme Court it was held the proceeding by the Secretary of War was not an arbitration, the Secretary of War was not an arbitrator, defined as a private extraordinary judge chosen by the parties who' have a matter in dispute, invested with power to decide the same,” but acted ministerially. In that respect the contention of counsel is sustained, although there are authorities to the contrary, but it is not held that the finding of the Secretary of War was subject to collateral attack. That is apparently the construction put by counsel on the repealing act, but that was not a collateral attack. The court said that the resolution of June 1, 1860, created a tribunal and *747 that it was competent for Congress to abolish the tribunal or commit its functions to another, and added rather significantly that “ the power that created this tribunal might rightfully destroy it, unless some rights had accrued which were the result of the creation of such tribunal and inseparable from it.” The marked distinction between that case' and this is in the facts that Congress did not repeal the-Dent Act and that the award of the Secretary was paid. Had the Dent Act been repealed and the tribunal created, thereby destroyed before payment was made we could not. have had the case now for consideration. As it is it would, seem that “ some rights had accrued which were the result of the creation of such tribunal and inseparable from it.”
Chorpenning v. United States, 94 U. S. 397, also involved a repeal of a former resolution authorizing the Postmaster General to investigate and adjust certain claims, and a prohibition against any payment under his finding. The original resolution had not, it is said, contained any stipulation of payment, express or implied, and none had been made. It is said by the Supreme' Court that the duty devolving, on the Postmaster General was ministerial and possessed no element of arbitration, to which it is added that “ the adjustment, having been made under a special law, renders it in no wise different as regards the point we are considering-from those made daily by the accounting officers of the Government under the general law conferring their powers and prescribing their duties.” The succeeding sentence, included in counsel’s quotation, is omitted, because possibly it would not have been so stated had the Dockery Act then been in force. But some antecedent language, reverting to conditions in that case, suggests some broad distinctions and possible inferences. It may also tend to explain the meaning of “ the point we are discussing.” It is said “ Congress for its own reasons simply directed an examination and adjustment. It gave no promise and came under no obligation to the other party, and asked and received none from him. The Government and the claimant stood and continued to stand wholly independent of each other. The Government could at any time before payment (italics ours) recall what it had done, and the claimant was at liberty at *748 the same period to refuse concurrence and assert aliunde his legal rights, if any he had. Prior to that time there could be no vested right and no commitment of either party, not subject to the exercise thereafter of such discretion, affirmative or negative, as might be deemed proper.” There is another distinction to be drawn as to this case applicable also under another subject for discussion.
The original counterclaim contained a general averment that in making his award the Secretary of War “ acted beyond his lawful authority” in that he included prospective profits, etc., which, as a general averment, is eliminated from the amended counterclaim which we are considering, and, referring to the facts pleaded as to various items alleged to have been made part of the lump-sum award, it is said that facts are pleaded “ sufficient to bring up squarely for decision the question as to the limits of the power of the Secretary of War under the Dent Act.”
There seems to be an inclination to turn the question of the “ power ” of the Secretary entirely upon the provisions of the act against the inclusion of certain things in the settlements made as if the question were primarily as to the “ power ” of the Secretary to include such items, whereas the primary question as to his power must be determined upon a construction of the. word as synonymous with jurisdiction; and, so considered, what has been said and the authorities cited under that head are applicable and require the conclusion that the power of the Secretary extended to the determination of such questions as must necessarily be determined to enable him to reach a conclusion.
The conclusive character of an award by the Secretary and accejotance by the claimant was considered by this court in Delaine Mills v. United States, 57 C. Cls. 453; and ahlthough that was an attempt by a claimant to secure further relief, and its right to further proceed in this court was under consideration, it was pertinently said by the Chief Justice, speaking for the court: “ But when the matter has been presented to the Secretary, or the board organized by him to hear and consider it, and an adjustment is offered and accepted as in this instance, there is no basis for further proceeding in the Court of Claims. A salutary purpose of *749 the Dent Act was to produce adjustments and settlements of a specified character of claims and not merely to produce or foster litigation. If the party accept the award, the purpose of the act is accomplished, and there is no need of further litigation.” See Nassau Smelting & Refining Works, Ltd., v. United States, decided by the Supreme Court November 17, 1924 (266 U. S. 101).
A claimant being estopped from any further remedy by acceptance of an award, a theory which was invoked by the Government in the Delaine Mills ease, it seems but a just application of the same principle to hold the Government equally bound, unless, of course, it has been “ defrauded.”
In the recent case of Work v. United States ex rel. Rives, decided by the Supreme Court March 2, 1925, 267 TJ. S. 175, and cited by both parties, are some observations inf erentially applicable and also a reference to some cases, among which are Ness v. Fisher, 223 U. S. 683, and Riverside Oil Co. v. Hitchcock, 190 U. S. 316, cited by the plaintiff herein, as to which it is said that they “ were all cases in which it was sought to control and reverse rulings of the Secretary of the Interior, on the ground that he had in the administration of the land laws made a ruling contrary to law against an applicant for action by him. In each case it was held that as the statute intended to vest in the Secretary the discretion to construe the land laws and make such rulings no court could reverse or control them by mandamus in the absence of anything to show that they were captious or arbitrary. It was pointed out that a mandamus could not be made to serve the function of a writ of error, and the mere fact that the court might deem the ruling erroneous in law gave it no power to intervene.”
The same proviso as that here involved is included in section 5 of the Dent Act, under consideration in the Work case, supra, and as to it it is said, in a review of the section, “By the fifth proviso, however, the Government was permitted, through any of its agencies or even by a committee of Congress, duly authorized, to review the settlement by the Secretary and by necessary implication, to reverse it. If the Government was defrauded, it was authorized to sue to recover the money paid under the award.” This language *750 seems to limit the application of the words “ if the Government has been defrauded” to the right to sue to recover money paid, and apparently recognizes the defrauding of the Government as the only basis for such a suit. Section 5 differs in some respects from section 1, but the meaning of this proviso, incorporating the same language in all material respects, would seem to be the same.
Many of the cases refer to the older case of Decatur v. Paulding, 14 Pet. 497, in which a distinction is drawn between mere ministerial duties which sometimes devolve on the head of a department and his executive duties,, from which it is apparent that the duties devolving on the Secretary of War under the Dent Act were not merely ministerial but were such duties as required t'he exercise of judgment .and discretion.
We refrain from what would seem to be an unnecessary review of many other authorities cited by both parties. Doth in some instances rely on the same authorities but differ as to their application. A consideration of each ■case would be of interest, but would unnecessarily lengthen .an opinion already too extended.
But there is yet another question which must receive consideration. It is contended in the second brief of defendant as the proper basis of recovery that the right always exists in the United States to recover payments illegally made by its officers, that payments were made which included sums of a character which were prohibited by the act in question and therefore unlawful, and that they may be recovered under the broad general right of the Government to recover illegal payments, without regard to the provisions of the act on that subject and “ fraud or no fraud.”
The invoking of this theory necessarily means a resort to the provisions of the act as authority for the assertion that payments made were illegal but a repudiation of the provisions of the act as to the remedy.
This is a theory which can not be recognized. The act ■creates a right which did not exist before and provided remedies and it is an established rule that where an act both ■creates a right and provides a remedy the remedy provided is ■exclusive. The remedy primarily provided in this instance *751 for the claimant was the right to present his claim to the Secretary of War and have it acted on. His further remedy was a right to appeal to this court if he was dissatisfied with the finding of the Secretary. If he accepted the award of the Secretary his right was to have it paid, closing the transaction, with the remaining right to the Government to recover the money paid if it “has been defrauded.”
There are many cases cited supporting the right of the Government to recover illegal payments and the rule is not disputed, but they are for the most part cases wherein certain prescribed payments were authorized without any discretion to vary them and where there is in connection with their authorization no provision with reference to a recovery and the rule applicable finds its foundation in the broad principle that where a specific payment is authorized any other payment is without even color of authority and hence illegal and the remedy follows, not as a matter of statutory provision, but as a broad substantial right in the Government.
But the rule, for manifest reasons, finds no proper application here. To resort to the statute for one purpose and ignore its provisions in another respect not only violates the rules of construction so strongly contended for but ignores the other rule that Avhere a new statute prescribes a remedy that remedy is exclusive, the prescribing of one remedy excluding all others. And therefore this statute may not be resorted to for the purpose of establishing the illegality of a payment made and resort be had to an extraneous remedy when there is provision on that subject in the statute itself.
What has been said, if correctly said, renders it unnecessary to decide whether the various items set out in the findings of the district board, Exhibit D, are to be read into the lump-sum award of the Secretary, Exhibit E, or to consider them in detail.
However, as to the detailed allegations, it may be said that such portions as plead conclusions are not to be taken as true on demurrer. The final averment as to each item is that the payment of that item “ was unlawful and void and that amount is recoverable by the United States.” This is, of course, a conclusion which means nothing on demurrer. *752 In so far as the specific facts alleged go to items involving “ reasonable remuneration,” we can not agree with the defendant’s construction of those words. In perhaps three items the allegations are designed to show the payment of prospective profits on parts of the contract “ beyond the goods and supplies delivered to and accepted by the United States.” The chief item in this category is an allowance of $656,394.05, described as “ 10 per cent profit on worked direct materials, labor, and overhead,” as to which it is averred that “ this item was in fact an allowance of 10 per cent profit on the costs incurred by plaintiff, including all costs of material, labor, and overhead expenses, on uncompleted carriages, which carriages were never completed and never delivered to the United States.” The Secretary’s award refers to “ 63 carloads of miscellaneous parts for carriages,” and it is averred in the counterclaim that these 63 carloads of parts “ were in fact materials and supplies purchased at the expense of the United States, which materials and supplies were in various stages of incomplete manufacture and in process of manufacture into gun carriages, and which materials and supplies were not such goods or articles as were specified in the order and were not delivered to and accepted by the United States as such.”
Completed carriages were the “ articles ” mentioned in the order. The phraseology used in the portion of the act in question is “goods and supplies;” the “bogey,” prospective proñts, a term well understood as the profits which, in suits as for a breach of contract, it is alleged would have been made on the contract articles if performance of the contract had been permitted. This item does not represent prospective or future profits on carriages but has its foundation in the work done in the fabrication of materials, etc., which it is averred were “in various stages of incomplete manufacture,” and embraces things done and not to be done. It would be strange if in a settlement to be on a “ fair and equitable basis ” there could be no compensation on account of parts in process of manufacture because the Government had prevented their assemblage into the finished “ articles.” But we find no occasion for further discussion of the de *753 tailed allegations as to the various items. What has been said on that subject was probably unnecessary.
It may perhaps be suggested with propriety that there are questions presented and discussed in the briefs, all of which have had our attention but which it has not seemed necessary to review here, and so with many authorities. If perchance our action in this matter shall be for review by a higher court, counsel will then no doubt fully present their divergent views and their supporting authorities without regard to whether or not they have entered into our discussion.
We conclude that the demurrer to the amended counterclaim should be sustained. It will be so ordered and the amended counterclaim will be dismissed.
Geaham:, Judge; Hay, Judge; Booth, Judge, and Campbell, Chief Justice, concur.